## SUPREME COURT.

THE PEOPLE *ex rel.* WILLIAM WILLSON agt. WILLIAM E. LATHROP, treasurer of the city of Rochester.

*Held,* in this case, 1. That it is the duty of the *common council* of the city of Rochester to raise the amounts necessary to *support the public schools,* and the *payment of teachers,* by the requisite taxes for that purpose; and the common council may raise in its discretion such sums as it may deem proper to *purchase sites, build and repair school houses,* within the limits prescribed by the charter for that purpose.

2. It is the duty of the *board of education* of the city of Rochester, and it has the requisite power in its discretion, to *disburse all such moneys* raised and received according to law, in purchasing sites, building and repairing school houses and supporting teachers, and discharge all the contingent and incidental expenses connected therewith.

3. The *board of education* can make no *valid contracts* except for the disbursement of the money raised, received and appropriated by law, and subject to its order for expenditure *during each current school year,* or which may remain in the treasury unappropriated by previous boards.

4. It is the duty of the *board of education* to distinguish in its drafts and orders upon the moneys in the hands of the treasurer, between moneys drawn for *building and repairing school houses,* and moneys drawn and appropriated for the *payment of teachers' wages;* and these funds should be *kept distinct in the books of the city treasurer,* and in the books of the *school superintendent.*

The draft in this case in favor of the relator, being upon its face an order to pay money for the building of a school house, and to be charged to that fund, the treasurer rightfully refused to pay it, there being no money in the treasury applicable to the payment of such order.

In refusing to make such payment the respondent simply performed his duty as treasurer of the city, intrusted with the public moneys, to keep faithfully such moneys, and allow no unlawful appropriation or diversion of the same from the particular object for which they were raised and designed by law.

*Monroe Special Term, March,* 1860.

MOTION for peremptory mandamus on notice.

In pursuance of section 175 of the charter of the city of Rochester, the common council, on the 15th day of June, 1858, certified to the board of education that it would place at the disposal of that board the sum of $10,000, for the purpose of building school houses and purchasing sites for the current school year. Shortly afterwards the common council reduced the amount to $5,000, which last mentioned sum, and no more, was raised by tax for that purpose.

The board of education during that year expended more money than was raised for that purpose, so that at the commencement of the school year for 1859 (first Monday of April) the building fund was overdrawn to the amount of $6,271.51. Such being the condition of that fund, the common council, at the commencement of the school year 1859, notified the board by their certificate that it would raise no money for that year for the purpose of building school houses and purchasing sites.

At a subsequent meeting held June 14, 1859, in levying the general city taxes, an item was included of $5,000, " to purchase and improve sites, and to build school houses." This was never certified to the board of education, as section 175 of the charter requires. The respondent, as city

treasurer, gave the board credit for this $5,000 on his books.

The school superintendent, with no other authority than the printed minutes of the common council, credited the building fund with it on the books of the board. The superintendent keeps the books of the board of education and the separate funds of the board. The city treasurer keeps but one fund, into which he puts all moneys belonging to the board of education.

Such being the condition of the finances, the board of education for 1859 made executory contracts for building and improving school houses, and purchasing sites, to the amount of nearly $30,000. One of those contracts was made with the relator, for the construction of a school house in district number seven, at a cost of $4,945.

At the time he entered into the contract the relator made inquiry of the president of the board of education as to the condition of the finances of the board, and was informed by the president that the building fund was largely overdrawn, and that, if the relator took the contract, there was no money which could be applied upon it that year. The condition of the building fund was well known, both to the relator and the board of education, at the time the contract was made.

The relator commenced work on his contract, and the board of education voted him a payment of $800 for work done thereon, and drew its order on the city treasurer for the amount, payable "when there is money in the treasury applicable to that purpose," and charge the same to the building fund. The treasurer refused to pay the draft on the grounds:

1st. Because there was no money in his hands applicable to the payment of the draft.

2d. Because the relator's contract was void, it having been made in violation of section 171 of the charter.

The relator applied to this court, on notice for a peremptory mandamus, requiring the respondent to pay the draft.

T. C. MONTGOMERY, *for relator.*
J. VAN VOORHIS, JR., *for respondent.*

E. DARWIN SMITH, Justice. The relator asks for a peremptory mandamus from this court, requiring the respondent, as treasurer of the city of Rochester, to pay to him the sum of $800, upon the order of the board of education of said city, given in pursuance of a resolution of said board, passed October 31, 1859, to apply upon a contract for building a school house in said city. The order, upon its face, directs the said treasurer to pay the sum therein specified to the relator when there is money in the treasury applicable to the purpose, and charge the building fund in pursuance of said resolution of the said board of education.

The respondent has refused to pay such order, upon the ground that there is no fund in the city treasury subject to the order of the board of education, applicable to the payment thereof. If this be so, the treasurer obviously could not lawfully pay the order in question, and this application must be denied.

It appears, and is undisputed, that at the time when the relator presented the said order to the respondent for payment, that there was, in fact, in the hands of such treasurer, money raised to improve sites and build school houses, more than sufficient in amount to pay the relator's claim; and it remains, therefore, to inquire whether such money was applicable to the payment of debts contracted by the board of education for the building of school houses in the year 1859.

The charter of the city of Rochester confides the government, control and care of the schools and school houses, and of all things relating thereto, to the board of educa-

tion, and constituting such board a corporation, with certain specific powers.

The moneys for the support of such schools, so far as it is not received from the state, and also the money required for the building and repair of school houses, and of all contingent expenses connected therewith, is raised by taxes imposed by the common council of said city, annually, in the same manner as other taxes.

It is the duty of the common council, under section 167, by tax, from time to time to cause to be levied equally upon all the real and personal estate in said city, such sums as may be necessary or proper for the purposes aforesaid, subject to the restriction in subdivision number six of said section, that the amount to be raised in any one year " to lease, alter, improve and repair school houses, and their out-houses and appurtenances, shall not exceed $3,000; and for the purchase of sites, and building and enlarging of school houses, shall not exceed $10,000." The moneys, when so raised, and all moneys by law raised or appropriated to, or provided for the support of said schools, are to be paid to the city treasurer thereof; and all such moneys are, by section 176, required to be deposited for safe keeping with such treasurer, *to the credit of the board of education*, and are to be drawn out in pursuance of a resolution or resolutions of such board, by drafts drawn by the president and countersigned by the clerk of said board, payable to the order of the person entitled to receive such moneys. The draft of the relator is in due form under these provisions.

The moneys raised for the support of the schools, and for the payment of teachers' wages, as well the public moneys received from the state, as those raised by the common council by taxes, the charter clearly designed to keep distinct from the funds raised for building and repairing school houses. Section 171 makes it the duty of the board of education to keep these funds distinct, and not

to exceed in their drafts upon either fund, during the current year, the amount provided for the particular expenditure in question.

It is clearly the duty of the board of education to keep these funds distinct in their accounts; and I think, also, it is by necessary implication of law the duty of the city treasurer to do so, and not to pay the drafts of the board of education unless there are funds in the treasury applicable to the purposes for which such drafts are drawn respectively.

Although there are, confessedly, funds in the treasury sufficient to pay the relator's draft, yet I think the respondent, as a faithful public officer, was bound to refuse payment if the order was unlawfully drawn. The question, then, for my consideration and decision is, whether the funds in his hands were lawfully applicable to the payment of the relator's draft. This court certainly ought not to require payment of said order, upon the assumption that the board of education may violate the law, by drawing indiscriminately upon the funds in the hands of the treasurer, subject to its order, in distinct disregard of their plain duty and the obvious intent of the law, that the funds for teachers' wages, and for the building and repairing of school houses, shall remain and be kept distinct, and be so used and appropriated.

It appears that on the 15th June, 1858, the common council certified to the board of education, pursuant to section 175, that it would place at the disposal of the board the sum of $10,000, for the purpose of building school houses and purchasing sites for the then current school year, which commences on the first of April of each year, when a new board of education goes into office; and that subsequently the amount was reduced to $5,000, and only that sum in fact raised.

It also appears, that at the commencement of the school year of 1859, the funds for building and repairing school

houses had been overdrawn $6,271.51. How this sum could be drawn from the treasury, in violation of law, I cannot conceive, except upon the ground that the board of education violated the law in drawing drafts upon the moneys in the hands of the treasurer, without distinguishing between the funds for the payment of teachers' wages and the funds for building and repairing school houses; and the city treasurer negligently paid such unlawful drafts without regarding this distinction.

In consequence of this overdraft upon the building fund in 1858, the common council, it seems, sought to rectify this misappropriation, by refusing to raise any money in the year 1859 for the building fund. But, it seems, after such refusal, and after certifying the same to the board of education, the common council did in fact raise $5,000 to improve sites and build school houses, and the same was included in the general tax of that year, but the amount was never certified to the board of education pursuant to section 175; but that omission I do not think a matter of any importance. It is this $5,000, which was in the hands of the respondent, except the sum of $1,429.85, drawn therefrom when the relator presented his draft for payment as aforesaid.

This $5,000 was, doubtless, raised and intended to meet, so far as it would go, the overdraft upon the building fund of the previous year; but being raised by the authority of law, for a specific object, it could not legally be diverted to any other purpose; and the common council, I think, could not appropriate it to meet or make up past illegal overdrafts. The common council, doubtless, possess a discretionary power to determine how much money they will raise in each year for the building and repair of school houses and the purchase of sites; but when the money is raised, and placed in the hands of the treasurer, it has passed obviously beyond their control. The responsibility of determining how much money for such purpose shall be

raised in each year is cast by the charter upon the common council; but the responsibility of distributing the moneys raised for that purpose devolves upon the board of education. The common council can refuse, in any year, to raise any money for the purchase of sites, and building and repairing school houses; but, if it raises the money, the duty and the right in law belongs to the board of education, to expend it in its discretion in building and repairing school houses, and making such alteration thereof and improvements as to that board shall seem proper. This is the very office and design of the board of education, and I think it cannot be doubted that, in the discharge of its appropriate duties, it may make all proper contracts like any other corporation. The only limitation upon its power to contract within the scope of its duties, is, I think, that it can make no valid contract, except for the expenditure of the public moneys furnished and provided for its use and expenditure by law. Its powers are special to use and expend, within the current school year, the money with which it is intrusted; and it may lawfully contract to that extent, and no further, except under section 182, to lease suitable rooms for the accommodation of schools in the case therein specified.

This brings me to the inquiry, whether the relator's contract was valid, which is disputed. I have no doubt of its invalidity, upon the principles above stated, as an executory contract. The board of education could not bind the city—could not bind itself—and could not create any valid obligation by contract beyond the funds placed under its control for the current school year. But if the board of education undertake to build a school house, so far as the work proceeds it may, at any time, lawfully make payment from the money at its disposal for such purpose; and the work begun by one board may, doubtless, be paid for by its successors. Although the work done by the relator, therefore, was performed upon an

invalid contract, yet the board of education, at any time hereafter, when it has funds applicable to the building of school houses, can, doubtless, lawfully pay the relator for the work done under such contract.

While it is true that the board of education is a corporation, yet this is so only to a qualified extent.  It is a corporation only for *public purposes*, and for the discharge of trusts purely of a public nature.  It has continuity, although the commissioners who exercise its powers are changed annually.  Yet I think it was the intent of the charter that each separate board of commissioners should exercise its power like other public officers elected annually, and that each board should not bind its successors by continuing contracts.  It is with this object that each board is to certify, on or before the first day of September of each year, the sums in their opinion necessary and proper to be raised under section 167, specifying the sums required *for the year commencing on the first day of April thereafter.*

The intent of this provision was that each board should make this certificate, with the view that the funds to be raised in pursuance thereof should be provided for the use and expenditure of the board of commissioners next to go into office, on the first Monday of April thereafter.  They are not to certify to raise funds for the use or expenditure of the board making the certificate.

This view is confirmed by section 175, which provides that the common council, " within fifteen days after receiving such certificate, shall determine and certify to the said board of education the amount that will be raised by them *for the year commencing on the first Monday of April thereafter,* for the purpose mentioned in section 167."

In view of this obvious intent of the charter, that each new board of education should commence the school year with the funds raised by taxes, and otherwise in the previous year, it is claimed by the counsel for the respondent

that the $5,000 raised in 1858 for building and repairing school houses, having been exhausted before April 1, 1859, and there being at that time not only no money in that fund, but it being in debt for overdrafts to the amount of $6,271.51, the money raised by tax for building school houses in 1859 belongs to the school year of 1860, and is not applicable to the payment of the relator's draft for that reason. I cannot see why this is not so. It seems to me quite clear, that the scheme of the charter for the control and management, and support of the schools, was to provide in advance by annual taxes, in connection with the public moneys received from the state annually for the support of the schools, &c., in and for successive annual periods; that each new board of commissioners, coming into office on the first of April, should have the specific funds previously provided and placed in the treasury subject to its order, in manner above specified for its expenditure during the school year; that it was to have power to expend such moneys and contract for the expenditure thereof, and no other or greater sums; and if there was no money in the treasury subject to its order, it could make no contract and incur no debts, except under section 182, as above mentioned. It never was the design of the charter to allow one board of education to contract debts binding on the city or its successors in office, except so far as funds were provided to meet such contracts. The school commissioners comprising the board of education, possess little more of authority than school commissioners and school trustees in the towns; they act by a corporate name, but they have only certain specific duties to perform, particularly defined, and can exercise no powers not expressly conferred, except such as are incidental to all public bodies and necessary for the proper discharge of the duties imposed upon them. Section 171 is a further confirmation of this view. It declares that it is the duty of said board, " in all their expenditures and contracts, to

have reference to the amount of moneys which shall be subject to their order during the *current year,*" (from April first, when they enter upon the discharge of their duties, till the ensuing first of April,) "for the particular expenditure in question, *and not to exceed that amount.*" These provisions of the charter were framed with reference to the imposition of the taxes in the fall of each year, and the collection through the ensuing winter, as was formerly the practice; but they remain yet in force, notwithstanding the time for the imposition and collection of taxes has since been changed by amendments of the charter.

The $5,000 raised in 1858 was, in my opinion, unlawfully expended before the first of April, 1859. On the first of April, 1859, the moneys which belonged to the current school year from April 1, 1859, to April 1, 1860, for building and repairing school houses, had been expended, and the funds for that purpose had been overdrawn $6,271.51.

When the relator made his contract, therefore, with the board of education, September 2, 1859, to build a school house in district number seven, there was no fund for building school houses subject to the order of the board, and they had no power to make such contract, of which it appears that the relator was distinctly informed at the time by the president of the board of education.

The contract being thus entirely unauthorized, the resolution to pay the $800 thereon was likewise unauthorized and void, and the relator is not entitled to payment thereof.

If one board of education could thus make contracts without any funds on hand with which to fulfill them, and bind their successors with debts thus incurred, the whole policy and theory of the charter in respect to the support of the public schools would be defeated, and debts might be contracted in advance of moneys to be raised for an indefinite period, and to an unlimited extent, by an improvident board of education.

The law is not so defective as to allow such a mischiev-

ous consequence to occur. The $5,000 raised by tax in 1859 belongs to the current year, from April 1, 1860, to April 1, 1861, and is subject only to orders drawn thereon by the authority of the new board which went into office on the first Monday of April instant. If such board thinks proper to recognize the claim of the relator, it will be entirely lawful for it to draw a new order upon the respondent for its payment, and to complete the school house in district number seven, provided for in the relator's contract.

If the members of the board of education, the school superintendents, or any other corporate officer, makes contracts or pays money without authority of law, they are subject to the ordinary responsibility of all agents assuming to act without authority; they are personally liable on their contracts, and for the misappropriation of the public moneys, and for willful violation of duty in misappropriating the public moneys, and also liable to indictment. I will re-state the views I take of the questions presented in this case for my decision involved in its considerations.

It is the duty of the common council to raise the amounts necessary to support the public schools and the payment of teachers, by the requisite taxes for that purpose, and the common council may raise in its discretion such sums as it may deem proper to purchase sites, build and repair school houses, within the limits prescribed by the charter for that purpose.

It is the duty of the board of education, and it has the requisite power in its discretion, to disburse all such moneys raised and received according to law in purchasing sites, building and repairing school houses, and supporting teachers, and discharge all the contingent and incidental expenses connected therewith.

The board of education can make no valid contracts except for the disbursement of the money raised, received and appropriated by law, and subject to its order for

expenditure during each current school year, or which may remain in the treasury unappropriated by previous boards.

It is the duty of the board of education to distinguish in its drafts and orders upon the moneys in the hands of the treasurer, between moneys drawn for building and repairing school houses, and moneys drawn and appropriated for the payment of teachers' wages, and these funds should be kept distinct in the books of the city treasurer and in the books of the school superintendent.

The draft in this case in favor of the relator being upon its face an order to pay money for the building of a schoolhouse, and to be charged to that fund, the treasurer rightfully refused to pay it, there being no money in the treasury applicable to the payment of such order.

In refusing to make such payment, the respondent simply performed his duty as treasurer of the city intrusted with the public moneys, to keep faithfully such moneys, and allow no unlawful appropriation or diversion of the same from the particular object for which they were raised and designed by law.

The application for a mandamus must be denied, with $10 costs.