Van Vorst, J.
The will of Ephraim Holbrook was executed on June 16, 1851, and the testator died on March 21, 1852. The testator left a widow, but no child or descendant him surviving. After making a distribution of about $30,000 of his estate, in legacies *384 among relatives and friends, the testator gave the income of the balance of his estate, with the exception of a small annuity to his sister, to his wife for life. He also gave to his wife the sum of $30,000 of the capital of his estate, to be disposed of by her as she might think best by her last will and testament, but in the event of her failure so to do, the testator himself disposed of same by his will. Upon the death of his widow, a distribution of the residue of his estate was to be made among the persons and societies selected by the testator as the objects of his regard and benevolence.
Notwithstanding the great care evidently taken in the preparation of this will, and the excellent professional aid had by the testator, several questions of interest and importance are involved in the construction of some of its provisions, arising not so much from any obscurity in the language of the instrument, as from an apparent conflict in decisions with respect to the same. And now, after the lapse of nearly twenty-five years from the execution of the will, the period for a final distribution of the estate by the death of the widow having arrived, this action for a construction of and decision upon certain of its provisions, and for a distribution of the estate, is brought.
A proper determination of the case is best attained by determining, in the beginning, some general questions which affect the whole estate, and in the light of which most of the provisions of the will about which doubts have arisen must be considered. No question arises in regard to the dispositions made by the will up to the eleventh clause thereof. To this point the legacies are conceded to be valid, and the will has been actually executed by the payment of the legacies without contention.
By the eleventh clause of his will the testator declares that the income, rents, issues, dividends, and *385 profits of his estate, which are thereby given to his wife, Nancy Holbrook, during her life, “ are to be paid to my said beloved wife, Nancy Holbrook, during the period of her natural life, by my executors half-yearly, or as often as the same shall be received by them.”
It was clearly the intention of the testator that the executors should collect the rents, income, and profits of his estate, for they were to be received and paid over by them. The words used express such intention with sufficient clearness. The executors are thus constituted trustees to receive and pay over the income arising from the estate. An authority to pay as the same should be received necessarily implies a power to collect. Executors as such have no control over the real estate, nor authority to receive its rents, and when by the terms of the will they are expressly invested with such power, they become trustees to collect, receive, and pay over in the manner the will directs. And though these rents and profits are given to the wife, she is to receive them from the persons who are alone authorized to pay the same.
By implication, therefore, the executors take an estate in the lands, and were enabled to let the same so as to enable them to receive and apply the rents and profits for the purposes of the trust.
To accomplish the purposes of the will in this regard, the presence of the legal title in the trustees is both convenient and necessary (Vail v. Vail, 4 Paige, 328 ; Bradley v. Amidon, 10 Id. 235; Craig v. Craig, 3 Barb. Ch. 77; Manice v. Manice, 43 N. Y. 303; Downing v. Marshall, 23 Id. 378).
This estate or interest in the executors lasted, however, only so long as the purposes of the trust required, and terminated with the death of Nancy Holbrook.
The executors are, "however, invested by the will with a valid power of sale of all and singular the real estate of the testator, and this power survived the ter *386 mination of their estate or interest in the land during the life of Mrs. Holbrook, and could be executed after her death, if not satisfied before (Manice v. Manice, supra).
We now come to consider this power of sale with which the executors are clothed, its extent, and its effect upon the real estate.
By the twelfth clause of the will, the executors, at such time after the decease of the wife of the testator as they shall think best, not exceeding three years, were directed to sell and dispose of all the real and personal estate of which the testator should die seized then remaining unsold, either at public or private sale, or both, as they should think most likely to obtain the largest aggregate amount therefor, and with the proceeds to pay off without delay the legacies, gifts, and bequests thereinafter declared, and all power needed fully to carry out this direction to sell, is given in the amplest manner in the eighteenth clause of the will. This absolute direction to sell stamps the quality of personalty upon the real estate, and it is subject to the laws of that species of property into which it was intended to be converted (Bogert v. Hertell, 4 Hill, 500).
“ The gifts were of money, the avails of the real and personal estate, and the conversion of the realty into personalty, under the authority conferred upon the executors, is regarded as having been accomplished at the death of the testator” (Chamberlain v. Chamberlain, 43 N. Y. 431).
Some question might arise under the terms of the twelfth clause as to whether the equitable conversion was complete before the death of Mrs. Holbrook, as the direction to sell therein contained was to be exercised after her death. But the eighteenth clause enlarges the power, and in effect removes such limitation over the exercise of the power of sale, as thereby the execu *387 tors are enabled and directed, “at such times as they may think most expedient and most for the interest of his estate,” to sell and dispose of the real and personal estate. The direction to sell was positive. The power to do so could be exercised at any time after the death of the testator, but must be within three years after the death of the widow; and, under the rule, that is always considered as done which is ordered to be done. The whole estate was equitably converted into money, for all the valid purposes of the will, at the death of the testator, and the same must be regarded, for the purposes of distribution under his will, as personal, and to be controlled by the law governing the testamentary disposition of personal estate, unless there be a failure in whole or in part of the object and purposes of the sale (Horton v. McCoy, 47 N. Y. 21; Dodge v. Pond, 23 Id. 69 ; Moncrief v. Ross, 50 Id. 431; Meakings r. Cromwell, 5 Id. 136).
At the death of the testator, all the legacies now under consideration, if valid, with the exception of those in favor of the ward schools, vested in interest, although they did not vest in possession until the death of Fancy Holbrook, December 18, 1874. The general rule to be extracted from the authorities is, that when legacies "are payable in the future without condition annexed, or any expressed intention of the testator to the contrary, whether they are of personal property or of real estate directed to be sold to discharge them, they vest at the death of the testator (Van Wyck v. Bloodgood, 1 Brad. 172; Parsons v. Lyman, 4 Id. 299 ; Matter of Trustees of N. Y. P. E. Pub. School, 31 N. Y. 589), and this, though a life estate may intervene before payment.
The' application of these general conclusions, here for convenience stated, will hereafter appear when those portions of the will concerning which questions have *388 arisen, and in which they are involved, come to be considered.
But the portions which require construction and judicial determination will be considered in the order in which they arise in the will.
By the eleventh clause of his will, the testator gave to his wife Nancy Holbrook, in case she should survive him, the sum of $30,000 of the capital of his estate, to be disposed of by her as she might think best, by her last will and testament, duly and properly executed, and the testator declared that, in case Nancy Holbrook should not survive him, or, surviving, should not make any disposition of the said $30,000 by her will, then it was the will of the testator that the amount be paid and disposed of to the persons named by him.
An examination of the entire clause shows that this was not an absolute gift to the widow of $30,000. The clause is entire, and the words of gift at its commencement are distinctly qualified, and it is in the light of such qualification that this disposition must be considered. This sum is given only to be disposed of by the last will and testament of the widow prop-' erly executed. And in the event of her failure to make such disposition the testator himself absolutely disposes of it, so that it can in no event fall into the residuary portion of his estate, so carefully afterwards disposed of.
Such qualifying words and control over and ultimate disposal by the testator himself of this fund, show that Nancy Holbrook was invested with a power of appointment as to the $30,000 of the capital of the testator’s estate, the power, however, to be executed only in the manner the testator had directed. As long as the widow should live, this sum would form a portion of the estate in the hands of the executors as trustees, to the income and profits whereof she would *389 be entitled for her life, and at her death would go to such persons as she might, by will, duly appoint.
I cannot but think, therefore, that as to this sum of $30,000, it was the intention of the testator that his widow should have a power of appointment only, and as such it is valid, the power to be exercised strictly in the manner directed by the will.
And this was done, for Mrs. Holbrook, by her last will and testament, with a codicil thereto, made in thee State of New. Jersey, in conformity with the law of that State, disposed of the same. Her will was duly proved in Morris county in that State, and is a valid compliance with the provisions of the eleventh clause of her husband’s will.
As to $15,000 thereof, she gave the same to the executors of her will, in trust, to pay the income thereof to her sister Julia Ann Cook for life, and upon the. death of her sister, the principal of said $15,000 is absolutely disposed of to other of her relatives. With respect to the remaining $15,000, although the same is actually disposed of by the will and codicil, yet the same is directed to be received by her executors, and the disposition thereof by them is coupled with the administration of her own estate, and dependent, to some extent, upon its sufficiency to pay certain legacies. The deficiency of her own estate, if any, to pay such legacies, is to be supplied out of this $15,000. The executors of her own will are charged by her with the payment of these legacies, as also with the payment of other moneys thereout, to the discharge of an incumbrance upon a certain, house and lot in New Jersey, and the residue of the moneys is to be held and applied by them upon certain trusts.
Now, although the $30,000 is, in fact, no part of her estate, and, had she died intestate, could not have passed to her legal representatives, yet I am of opinion that the executors, under the will of Ephraim Hoi *390 brook, are authorized to pay the whole sum of $30,000 to the executors appointed under the will of Nancy Holbrook, who have legally qualified, to be held and applied by them according to the bequests and directions contained in her will, and upon the trusts and for the purposes therein declared; and that such payment will be a disposal of that sum according to the appointment of Nancy Holbrook.
Convenience clearly suggests that the application and final payment of the moneys, according to her appointment, should be made by her executors, as specific duties are cast upon them in respect thereof. No rule is violated by such direction, and no interest put in jeopardy.
The parties in interest are all before the court, and the judgment to be given herein will make express directions how the funds shall be paid and applied by the executors, and who shall receive the same in pursuance of the provisions of the will of Nancy Holbrook.
Although there is nothing in the will which in terms declares that the provisions made by the testator in favor of his wife were to be received by her in lieu of dower in his estate, yet I am of the opinion that such was the intent of the testator, and that the same was so regarded by the widow during her life. For she, subsequent to her husband’s death, executed and delivered to the executors of his will an instrument, under her hand and seal, by which she renounced and disclaimed all dower and right of dower, which she might or could have in or out of all the real estate devised by her husband, and accepted the provisions and bequests made in her favor, in lieu of such dower or right of dower.
The gift of the $30,000, made 11 out of the capital” of the estate, and as it were distinctly set apart therefrom, was absolutely, in its entirety, subject to the *391 disposal of the widow by her will, and became vested in interest in the appointees at her death, in virtue of the execution by her of the power conferred upon her, and could have been devoted by her to the payment of her own obligations.
If I am correct in the conclusion that the provisions in her favor contained in her husband’s will were in lieu of dower, this specific bequest of thirty thousand dollars would not abate in the event of the failure of the remaining estate of the testator to pay in full the other bequests made by him, for the reason that her power over its disposition, was in part given as an equivalent for a relinquishment of her right of dower (Williamson v. Williamson, 6 Paige, 305).
By the fifteenth clause of the will, gifts amounting in the aggregate to about the sum of ninety-five thousand dollars, are made to various benevolent, charitable, and educational corporations, societies, and bodies, to many of which specific objections are interposed by the heirs at law of the testator, and which are now to be.considered.
To the “New York Association for Improving the Condition of the Poor” is given the sum of ten thousand dollars. This association is also one of the residuary devisees and legatees.
With regard to this association, it is objected that it was not, on March 21, 1852,—the day on which the testator died,—legally incorporated in accordance with the provisions of the statutes of the State of New York, and was not at that time a corporation within the provisions of the statute, and is not competent to take.
James Brown and twenty other persons, on December 11, 1848, signed and acknowledged before an officer authorized to take the acknowledgment of deeds, a certificate in writing, in which was expressed their intention to become a body politic and corporate, for *392 benevolent and charitable purposes according to the provisions of an act for the incorporation of societies for such purposes, passed April 12, 1848. The certificate was approved by a justice of the supreme court, on December 14, 1848, and was filed in pursuance of the allowance of the justice indorsed theron. The association, from the period of the making and filing of the certificate, has maintained its organization and work, and has acted as, and claimed at all times to be, a body corporate, and has made regular annual reports of its work and proceedings. The testator had, up to the' time of his death, been connected with the association as an active member and officer. The objection urged is that the certificate of incorporation does not state the number of trustees, directors, or managers to manage the same, in pursuance of section 1, chapter 319 of the laws of 1848. It is true the certificate does not state in terms the number of persons who shall manage the affairs of the corporation, but it does in substance. By the third section of the certificate it is declared that the board of managers to manage the same shall consist of one president, five vice-presidents, and other officers mentioned, and in the fourth section it names the persons with their, offices who were to manage the same the-first year.
This certificate I conclude to be a substantial compliance with the provisions of the statute in question. The approval of the justice of the supreme court, and the acceptance of the certificate by the secretary of state, in whose office it was filed, was sufficient evidence of compliance with the law, to justify the corporators to believe that they had conformed to its provisions, and that they had become, by the making and filing of the certificate, a body corporate, and for the purpose of taking the bequest in question, this association must be deemed a body corporate.
A substantial compliance with the statute is all that *393 is necessary. In the case of the People v. Nelson, 46 N. Y. 477, the certificate was fatally defective in substance, and the secretary of state properly refused to file the same, and the decision was that he could not be required to file a certificate unauthorized by law.
But it is objected upon another ground that this corporation cannot lawfully take the provisions in its favor under the will, and it is urged that the same objection applies to the gifts made to the Demilt Dispensary, the American Female Guardian Society, and the Few York Sabbath Tract Society severally, also incorporated under the act of 1848.
Section 6 of the act in question declares that any corporation formed under that act shall be capable of taking, holding, or receiving any property, real or personal, by virtue of any devise or bequest contained in any last will or testament, the clear annual income of which devise or bequest shall not exceed the sum of ten thousand dollars, provided no person leaving a wife or child or parent shall devise or bequeath to such corporation more than one-fourth of his or her estate, after the payment of his debts. The testator, as has been seen, left a wife him surviving, and was prohibited by the section above mentioned from devising or bequeathing to societies incorporated under that act more than one-fourth of his estate, after paying his debts. The bequests made to these four corporations by the fifteenth clause of the will are the sum of ten thousand dollars to the Association for the Belief of the Poor, to the Sabbath Tract Society one thousand dollars, to the Demilt Dispensary five thousand dollars, to the American Female Guardian Society two thousand dollars. In addition to these bequests the Association for the Belief of the Poor by the provisions of the will is entitled to one-sixth of the residuary estate. If these gifts and bequests amount in the aggregate to more than one-fourth of the estate after, the payment *394 of the testator’s debts, they must be severally reduced by proper deductions so as to bring them within such one-fourth, each contributing its proper rateable proportion to such deduction. This was the rule adopted in Chamberlain v. Chamberlain, supra.
But devises and bequests made to corporations other than those above named, and not affected by the limitation imposed by section 6 above mentioned, are not to be taken into account in this connection, in determining how much of his estate the testator has given to corporations organized under the act of 1848. And in determining how much the Association for the Relief of the Poor will take, under the residuary clause, all valid and invalid legacies must be deducted.
A careful consideration of the evidence satisfies me, that after deducting the debts of the testator, the legacies to the four corporations, which amount to $18,000, together with the one-sixth of the residuary estate to which the Association for the Relief of the Poor is entitled under the sixteenth clause of the will, do not amount to one-fourth of the testator’s estate. The gifts to such of these societies as were incorporated at the death of the testator are therefore decided to be valid.
By the fifteenth clause of his will, the testator gave to the New York Protestant Orphan Asylum $6,000; to the New York Institution for the Blind, $10,000 ; to the New York Institution for the Instruction of the Deaf and Dumb, $10,000; and to each of the three last named institutions is also given one-sixth of all the residue of the testator’s estate.
It is objected on the part of the heirs-at-law of the testator, that these corporations were severally limited by their charters to the amount of property they could take and hold, and that at • the death of the testator they held up to, and beyond the limit imposed by their charters.
*395 The Orphan Asylum Society in the City of New York was incorporated by a special act of the legislature, on April 7, 1807. By its charter it was made capable in law “of purchasing, holding, and conveying” any estate, real or personal, for the use of the corporation, provided that such estate shall never exceed in value $100,000. By an act of the legislature, passed March 16, 1850, amending its charter, it was provided that the corporation is authorized “to purchase, hold, and convey” any estate, real and personal, for the use of the said corporation, provided that such estate shall never exceed in value $200,000. This limitation existed unchanged at the death of the testator in 1852.
The acts of the legislature passed in the years 1859 and 1872, by which the charter of the corporation is further amended, by the former of which, the corporation is authorized to purchase, hold, and convey estate, real and personal, to an amount not exceeding $250,000, and by the latter to an amount not exceeding $1,500,-000, cannot affect the gifts in question, as the gifts, if they vested at all, did so at the death of the testator, and subsequent statutes could not divest the rights of others which attached, if the gifts under the will were invalid.
The right of this corporation to the provisions made in its favor, must be determined by the law in force when the will of the testator in that regard, was intended by him to take effect (Leslie v. Marshall, 31 Barb. 560 ; White v. Howard, 46 N. Y. 144).
The learned counsel for the Orphan Asylum Society earnestly contends that no such objection as is here interposed by the heirs-at-law can be raised by them ; and that notwithstanding the limitations contained in its charter, the provisions in its favor under the will, vested in interest in the corporation at the death of the testator, and that it is for the State alone, through the *396 attorney-general, to inquire into the subject, and by appropriate action take advantage of the restrictions upon its capacity to hold the gift, if in excess of the amount limited. Leasure v. Hillegas, 7 S. & R. 319 ; Runyon v. Coster, 14 Pet. 128; Baird v. Bank of Washington, 11 S. & R. 411; Baker v. Clarke Inst. for Deaf, 110 Mass. 88, and other cases, were cited upon this subject upon the argument. These cases show that the title to property held by corporations in excess of charter capacity, is defeasible only by the State.
But the question presented here is whether the corporation can take, not whether taking, it can hold.
Rainey v. Laing, 58 Barb. 453, is the only case in this court to which direct reference is made. That case decided that whether the property, with that which the corporation already held, would exceed in amount the sum to which its charter restricted it, could not be ' tried in an action brought by the executors for the construction of the will; that that question was not to be determined collaterally, but only in a direct proceeding by the State. In that case it was provided by the law of its incorporation that the corporation should not take and hold real and personal property of the yearly value of over $10,000. In its decision, the court says : ' The corporation can take ; whether they can hold is another question, not necessary in this collateral way to be considered, which is purely one of public policy, with which individuals have no concern.”
At common law a corporation can take personal property by bequest to any amount (Angel & Ames on Corporations, § 145 ; Sherwood v. Amer. Bible Society, 4 Abb. N. Y. App. Dec. 227.)
With respect to the corporations under consideration, although “ authorized to purchase, hold and convey,” it was upon the express proviso that such estate shall never exceed in value $200,000. As purchasing *397 includes taking by bequest, it must be held that its common law capacity is abridged by its charter.
The case of Chamberlain v. Chamberlain, supra, is an important one, and would seem to have disposed of the subject, and as far as Rainey v. Laing conflicts therewith, it must be regarded as overruled.
Allen, J., says: “ Doubtless the restriction upon corporations is a governmental regulation, and one of policy, and to be enforced by the government; but an individual whose interests are affected by a transgression of the rule, may assert and insist upon the limitation as a restriction upon the power of the corporation to take.”
The “Centenary Fund Society,” one of the corporations to whom a bequest had been made, was by its charter authorized to take and hold land and money given and bequeathed to it. And by a statute of Pennsylvania subsequently passed, it was authorized “to take, receive, and hold” property to a limit prescribed. The Chamberlain Institute, the other corporation interested in the bequest, could by statute take and hold, by gift, grant, or devise, real and personal property, the clear yearly income of which should not exceed the value of $4,000 (1B. 8. 462, § 62.)
Allen, J., said: “ The institute can take and hold property within the limits prescribed, but can neither take or hold in excess of that limit; effect will not be given to a transgressive bequest in excess of the amount authorized. This decision, it is clear, applies to the case under consideration, and involves 'an examination into the evidence to ascertain whether or not the gifts to this corporation are in excess of what it may take or “ take and hold.”
[The learned judge here reviewed the evidence as to the value of the property, and held that, upon the best approximation which the evidence adduced enabled him to make to the value at the time of the testator’s *398 death, the receipt of the gifts, at that value, would increase the amount of property then allowed to be received and held under the charter by $2,650, which accordingly must be deducted; but, upon a further examination of the case, in respect to the value of the. gifts to the orphan asylum, it appeared that the same did not exceed the amount it could legally take, in addition to the property it already held, and no deduction was made.]
By the provisions of the will, the Yew York Institution for the Blind is entitled to a legacy of $10,000 and one-sixth of the residuary estate. This institution was incorporated by an act of the legislature, passed April 21, 1831, and was made “ capable in law of purchasing, holding, and conveying any real and personal property,” for the purposes of their incorporation and none other, “which at any time shall not exceed the annual income of $10,000.” Evidence was introduced by the heirs-at-law of the testator to show the value of the buildings and grounds owned and occupied by the corporation, between Eighth and Yinth avenues, and Thirty-third and Thirty-fourth streets, in the city of Yew York.
These grounds had been acquired by the corporation in and previous to the year 1847, and at a cost to the institution of about $30,000. The construction of the buildings thereon by the incorporation involved the expenditure of about $80,000. The entire premises occupied by its main buildings, dormitories and work-shops, are used for the care, training, and instruction of the blind. Yo income, aside from its use by the corporation for these purposes, is derived from the premises. The shops, in which are carried on the simple pursuits in willow-working and weaving, in which the blind are instructed, are not a source of income. According to the report made to the legislature in 1847, it appears that the sale of the articles did not more than reimburse the *399 cost of their manufacture. The chief, in fact only, purpose being to instruct the beneficiaries of this charity in some pursuit adapted to their condition of blindness, and in which they might be useful.
The evidence shows that the society was not in the receipt of any income, and was sustained by the gifts of the charitable and donations made from time to time by the State ; and from these sources indeed the funds had been obtained to purchase the grounds and construct the buildings. It is in evidence that the value of real property on the streets and avenues upon which this property is located, had largely advanced between the time of the acquisition of title by the corporation and the death of the testator in 1853, and it is claimed by the counsel for the heirs, that for building purposes the separate lots of which the plot belonging to the corporation is comprised, exclusive of improvements, were collectively worth over $150,000 in 1852; from which it is argued that the value of the use of the entire premises with its buildings to the corporation was over $10,000 ; this result being based upon the assumption that real estate should yield an income of from seven to ten per cent. And there is evidence rending to show that to be remunerative, real estate should yield such income.
I cannot accept any such conclusion as to the income of this corporation in 1852, nor any result based upon such premises. Notwithstanding the increased value of the land, even though it be accepted as, a fixed one, and not liable to fluctuation, yet it was used no otherwise in 1852 than it had been when originally acquired and improved, and could in no way consistent with its use by the corporation, be made to realize an income upon any basis of increased value in the land. However valuable the property, it could be used only in 1852, as it had been theretofore, for school-rooms, dormitories, workshops, and grounds for the training, *400 instruction, and recreation of the blind inmates. This corporation, an organized charity, in order to keep within the supposed increase of its income, by the increased value of its lands, if devoted to other purposes, should not be called upon, to avoid a forfeiture of its* corporate franchises, to sell its property or curtail its benevolent operations within limits in which it would cease to be useful, and locate elsewhere, and thus put in peril, by constant change of location, the purposes for which the charity was organized.
I apprehend that there is no true relation between income, even if the use of the property by the corporation be regarded as income, and the increased value of the land for commercial or purposes other than those for which they were acquired and fittingly improved. The legislature which created the corporation, was advised from time to time, by its annual reports submitted to it, of the property it held. The document put in evidence,—a report made in 1847,—contains a statement in detail of its property, since which time there is no evidence that its property has been added to, or that it has received money or property other than from the benevolence of individuals, or gifts from the State, to defray the cost of the maintenance and training of its pupils.
Nor am I inclined to regard the use which the corporation derives from the premises in question, for the purposes of the corporation, as “annual income” within the meaning of that term, or of the act of the legislature. Annual income, is annual receipts from property. Income means that which comes in or is received from any business, or investment of capital, without reference to the outgoing expenditures (People v. Supervisors of Niagara, 4 Hill, 20).
The words ‘‘annual income” are not the equivalent of “annual value.” Property may have an annual *401 value without any income (Troy Iron and Nail Factory v. Corning, 45 Barb). 231-247).
Besides, if the value of its use is to be regarded as an equivalent for annual income from the property, such value is not to be estimated upon a fluctuating standard of the value of the real estate, if devoted to other purposes, or the cost of the peculiar improvements made upon it in this instance, but upon its use to this corporation for the special purpose to which it is adapted, from its construction as an asylum for the • blind, or kindred purpose.
And as to this value, there is no evidence that it equals or approximates the limit, to which the corporation is limited by its charter.
For these reasons I am of opinion that all the provisions of the will in favor of the New York Institute for the Blind are valid, and this corporation is legally entitled to take and hold the gifts in its favor.
The Institution for the Instruction of the Deaf and Dumb, to which is given, under the fifteenth clause, $10,000, and which is also entitled, by the terms of the will, to one-sixth part of the residuary estate, was incorporated by an act of the legislature on the 15th day of April, 1817, and was made capable in law of “ purchasing, holding, and conveying ” any real or personal estate for the purposes of the corporation and none other, which at any time shall not exceed the annual income of $5,000. On April 11, 1849, the charter was amended by adding thereto the following :
“ § 7. It shall be lawful for the said institution to take and receive by gift, grant or devise real and personal estate or the proceeds thereof, to be used and applied for the purposes of said institution.”
At the death of the testator, the corporation was seized of a valuable estate, upon which was erected the asylum buildings. Since its acquisition by the corporation, the ground had increased in value, and was *402 worth in 1853 over $350,000. But the land and buildings were occupied and used for the purposes of the corporation solely. The State had contributed largely to the construction of the buildings and the improvement of the grounds, and it had made considerable appropriations of money for the support of deaf and dumb patients, received from various senatorial districts under State regulations. But, as was the case with respect to the Institution for the Blind, the corporation held no property which yielded income.
By its original charter the corporation was not enabled to take by devise, but this inability was removed by the amendment of 1849. But I do not regard this amendment as abrogating the limitation as to the amount of property yielding an annual income, which it was authorized to hold by its original charter. The provisions of the charter and the amendment, in this regard, I do not regard as in conflict.
If I am correct, however, in the conclusion reached with respect to the Institution for the Blind, that the use by itself for the purposes of its incorporation of its grounds and buildings is not to be regarded as annual income, and as it had no annual income from any property, real or personal, the provisions in the will in respect to this corporation are valid, and it is entitled to receive the legacies and gifts made to it by the testator.
It may be observed with respect to these three corporations last above named that the restrictions in their respective charters are as to the amount of real and personal property which they might severally take and hold yielding annual income. There is no direct restriction as to gifts of money or property to be used and applied towards the immediate support of the institutions, and their patients or pupils. The maintenance of these charities requires large funds, in excess *403 of the annual income they are authorized to receive from property.
There is • nothing in the will of the testator from which it is to be inferred that it was any part of his design, that these corporations should hold his gifts as investments. They can take and apply the whole to the current wants and necessities of the institution. In this respect the will under consideration differs essentially from that disclosed in Chamberlain v. Chamberlain. There, by the express terms of the will, the moneys bequeathed were directed to be kept permanently invested, and the income only used for the benefit of the college and academy.
It is apprehended that the vice against which the legislation under consideration was chiefly directed, was the ‘ ‘ Jiolding ’ ’ of immoderate amounts of property, real and personal,' by corporations, without reference to casual donations from the benevolent, by bequest or otherwise, for their daily maintenance. I do not deem it important to press this point further, the decision being placed upon the grounds first above suggested.
[The learned judge then discussed the claim of the American Home Missionary Society, and adverted to the decisions of the court of appeals, and concluded that they controlled his decision of this case, and that the question of a distinction in favor of associations within the statutes should be presented in that court.*
The opinion then proceeded as follows :]
The result reached is, that the gifts to the unincorporated societies are void.
The bequest to the Marine Bible Society is not saved from such conclusion for the reason that it is auxiliary to the American Bible Society, which is incorporated.
*404 The gift is not to the corporation, for which provision is elsewhere specifically made in the will. The auxiliary society had its own organization and officers. The assignment of the gift by the auxiliary to the parent society, will not enable the latter to take the bequest. If this society had not capacity to take, it had nothing to assign. Nor can the court, by an attempt to approximate to the testator’s intention to devote this specific sum to the work in which the auxiliary society was engaged, transfer the same to the American Bible Society, whose peculiar claims upon the testator’s benevolence had not been overlooked.
By the fifteenth clause of the will, the testator gave to the board of education of the city and county of New York, five thousand dollars .to be applied to the purchase of books for the library of the Free Academy of the city of New York.
By the act of July 3, 1851, chapter 386 of laws 1851, section 2, the board of education was empowered to take and hold property, both real and personal, devised or transferred to it for the purposes of public education in the city of New York, and for the purposes of the act was clothed with the power and privileges of a corporation.*
The Free Academy, now the College of New York, is a part of the common school system of the city of New York, under the supervision, management, and care of the board of education, and the purchase and supply of books for its library is clearly within the powers and duties of the board, and among the acts necessary and expedient to enable the academy to be properly and successfully conducted (Subdivision 5 of § 3 of the act).
This gift to the board of education is therefore valid.
*405 By the same fifteenth clause, the testator gave to the board of trustees of common schools of each of the several wards of the city of New York as they might exist at the time of the final distribution of the residue of the testator’s estate, and in which there should be a ward school, the sum of $250 for each such ward school in such ward, to be by them applied to the purchase of books for the establishment or increase of a suitable, school library, for each such ward school in the respective wards.
The right of the board of education to the bequest in its favor of $5,000 is made sure by its capacity to take by devise, which includes bequest, and also by its corporate capacity for the purposes of the act above referred to.
But the right of the boards of trustees of the common schools in the various wards in the city of New York to take the specific bequests made to them, determined strictly through the powers conferred by that act, is not so clear.*
*406 Section 3 of chapter 318 of the laws of 1840 provides that real and personal estate may be granted to trustees of any school district in trust for the benefit of the schools of such district.
Section 1 of chapter 261 of the laws of 1841 provides that “ devises and bequests ” of real and personal property in trust for any of the purposes for which such trusts are authorized under the act of 1840, and to such trustees as are therein authorized, shall be valid in like manner, as if such property had been “granted and conveyed” according to the provisions of the aforesaid act.
Section 1, chapter 150, laws of 1842, entitled an act “to extend to the city and county of New York the provisions of the general act in relation to common schools,” extends the powers and duties of trustees of school districts to trustees of ward schools in the city of New York, and provides that “ the trustees of common schools so elected, in their respective wards, shall be trustees of the school districts which may be formed or organized therein, with the like powers and duties as the trustees of school districts in the several towns in this State, except as hereinafter provided.”
But section 40 of the act of July 3, 1851, repealed *407 the act of April 11, 1842, and all other acts and parts of acts inconsistent with, or repugnant to, the provisions of the act of July 3, 1851, and the question now presented is, does the latter act enable the trustees to take, or are the boards" of trustees in question outside the provisions of that act capable of taking the legacies in question %
By section 10 of the act of July 3,1851, it was made the duty of the trustees for each ward, and they were empowered “to have the safe keeping of all the property belonging to the ward schools and primaries in their respective wards.” Also “to hold, as a corporation, all personal property vested in or transferred to them for school purposes in their respective wards.” Now, as far as the title to all school property, real and personal, purchased with any money derived from the distribution or apportionment of the school moneys, or raised by taxation in the city of New York is concerned, the same was, by the provisions of the act, vested in the mayor, aldermen, and commonalty of the city of New York, but was to be under the care of the board of education, in whose name all suits in relation thereto were to be brought. But as all the moneys required for the purposes of common school education in the city of New York, for the construction of school houses and furnishing the same, and for the entire support and maintenance thereof in the manner indicated in the act above mentioned, were derived from the sources named, it would seem that it was not property acquired from these sources which was to vest in the trustees of the ward schools.
The section in question, it would seem, has reference to property acquired otherwise than through moneys derived from the common school fund, or raised by taxation through municipal agency.
All school moneys raised or obtained for school purposes by the provisions of the act went into the city *408 treasury, and were disbursed by and through the agency of the board of education, whose duty it was to furnish all necessary supplies for the schools. No portion of these moneys could come into the hands of the trustees.
Section 16 of the act of 1851, provides that school moneys could only be drawn from the city treasury upon drafts on the chamberlain, drawn by the board of education, signed by its president, made payable to the person entitled to receive the same.
It is quite evident that the testator intentionally and understandingly discriminated, as to the persons or agencies through whom his benevolent purposes with respect to the schools should be carried into effect.
The board of education had the exclusive charge and control of the Free Academy. The school trustees had no concern in its management or its property, and thus a bequest to that board would enable it to receive and apply the money for the use designed by the testator. Nor would the title to the same vest in the city of New York, as the moneys were not derived from the school fund or taxation.
On the other hand, the school trustees for each ward had the more immediate care, control, and oversight of the ward schools of which they were officers under general rules and regulations of the board of education.
The body of school trustees for the respective wards is not a voluntary association. They are officers chosen in pursuance of law, upon whom are cast duties in respect to the schools so as to secure their efficient working. The body has regular succession, and, as trustees go out of office, they account to their successors for all moneys received by them for school purposes. *409 designated the body as a “ board of trastees,” and collectively they are a corporation to the extent of holding property transferred to them for school purposes.
As it appears from the act in question that no part of the property derived from the public funds can vest in them, it must follow that the property which becomes vested in the trustees, and which they may hold for school purposes, must proceed and be acquired from other sources.
I see no difficulty in the boards of trustees of the several wards accepting these bequests, and executing the trust imposed by the will, through the application of the moneys in the manner directed. It is directly within the scope of their general duties. When the moneys are received, they vest in them as trustees, and will be held by them as a corporation. And their application to the specific purposes designated can be compelled. Devises or bequests to trustees for the purposes of founding a library or school create legal and valid trusts (Owen v. Missionary Society, supra).
There is nothing in the act in question from which it can be reasonably argued that in composing this body of trustees, and in providing for its continued succession, it was the intention of the legislature to inhibit its taking by bequest personal property. Beal estate the trustees cannot take by devise. The board of education can so take.
But I am of opinion that the capacity of the trustees to hold personal property, to which extent it is substantially constituted a corporation, would embrace the power to receive by bequest. And such conclusion is in.harmony with the rights and powers conferred upon trustees of school districts by chapter 318 of the Laws of 1840, and chapter 261 of the Laws of 1841.
No sufficient reason can be assigned why the trustees of ward schools in the city of New York, in the absence of express legislation to the contrary, should not take, *410 by bequest, personal property for educational purposes. No such implication arises from the fact that the board of education may take by devise, for by the acts above referred to devises and bequests may be made not only to the commissioners of any town but to the trustees of any school district in trust for the benefit of the common schools of the town.
A defeat of the testator’s thoughtful provision for these ward schools would not be justified except the provisions of the will in this regard are clearly void through express words of a statute forbidding the trustees, to take by bequest, or by a necessary implication • arising from the words used.
For it must be considered that the trustees can hold property for educational purposes—they are so enabled; that such property can be transferred to and will vest in them. Such property could as well vest through the dispositions of a will as by gift inter vivos, and can be transferred by the executors of the deceased into the actual custody of the trustees. Corporations, in the absence of statutes prohibiting, may take all the usual methods of acquiring property.
The next question which arises is: Do the provisions of the will which give effect to these bequests, at the time of the final distribution of the testator’s estate, invalidate the gifts to the school trustees ?
By the twelfth clause of the will, the executors are directed at such time after the decease of his widow as they should think best, not exceeding three years, “ to sell and dispose of all the real and personal estate, of which the testator should die seized or possessed, then remaining unsold, at public or private sale, and to pay off, without delay, the legacies, gifts and bequests named,” but in the closing paragraph of the will, the executors are fully authorized and empowered to sell all the testator’s real estate, at such times as they shall think most for the advantage of his estate.
*411 It was clearly not the intention of the testator to create an illegal suspension of the power of alienation of any part of his estate, nor to postpone its final distribution beyond the period of his widow’s death. That event was really to determine the period for the final distribution among the legatees. The testator’s care was that his widow for life should have ample provision for her support, and to this end the income of his whole estate was pledged. It was not contemplated that the property should be tied up for any purpose, nor was any estate in trust continued in the executors from and after that event.
It is quite clear that from and after the death of Mrs. Holbrook, the only remaining authority in the executors was a power and absolute duty to sell and distribute the estate and its proceeds. In legal effect the will contemplated distribution at that time. Its provisions are constructed upon that basis. Ho purpose was to be subserved by any postponement, and in construing the will a conclusion should not be adopted which would involve an illegal rather than a legal purpose when the latter fairly and reasonably arises from the language of the testator. It is unreasonable to suppose that a sale of the real estate could be made immediately upon or after the death of the widow. Such disposition must of necessity require some time to arrange its details as to the manner and time of sale, and an adjustment perhaps with tenants ; and time for such purpose has never been regarded as a postponement of the vesting of an interest in the devisee or legatee.
The testator provided only in effect that the sale should in no event be delayed beyond three years. This was not an unwise direction in the light of experience in such cases, but was an injunction to avoid delay in closing up the estate.
But such injunction against postponement beyond *412 that period does not suspend the power of alienation for any period after the widow’s death, for there was a general authority to sell at such times as the executors think best, under which power the property could have been, sold even in the lifetime of the widow, and a distribution have been made immediately thereafter (Converse v. Kellogg, 7 Barb. 590 ; McKinistry v. Saunders, 2 Sup. Ct. [T. & C.] 200-202; Manice v. Manice, supra).
Nor was. there a moment of time after the death of Mrs. Holbrook when there were not school trustees legally constituted and clearly indicated by the will, who would immediately take into their actual possession, and to the use intended, the bequests in question.
But another question arises at this point with respect to these bequests, from the words of the will. The bequest was to the board of trustees of each of the several wards as they may exist at the time of the final distribution of the estate. The testator seemed to contemplate as likely to occur in the future what had transpired in the past, a change in the boundaries of the city wards, which might let in before the death of his widow, new boards of trustees in new wards, carved out or otherwise constituted, from existing wards. The intention of the testator was to provide for all ward schools which might be in existence at the time of the death of his widow, within the territorial limits of the city as existing at the time of his own death. I do not think the provision can be extended to embrace schools in wards created in territory annexed to the city limits since the testator’s death. Whilst he did contemplate that by increase of population old wards might be divided and in this way new ones created, he did not provide for schools in territory to be after acquired.
In this view the bequest being determined to be legal, the board of trustees of each of the several wards within this limitation, in which a ward school above *413 the grade of primary existed at the death of Mrs. Holbrook were entitled to take, and took $250 for each such ward school.
By section 6 of the act of 1851, above referred to, all the schools organized thereunder are designated “ward schools,” or “ward primaries,” and each class are directed to be numbered consecutively according to the time of their organization or adoption.
- The schools in each class, presumably at their organization or adoption, have been numbered by the school authorities, so that at the time of the death of the testator the “ward schools,” according to a consecutive numbering, had reached the number of forty-six, and at the death of Mrs. Holbrook, had increased to fifty and upwards.
These schools were all above the grade of primary, and are ordinarily called grammar schools. But these schools so numbered, consisted in nearly every instance of two, and in may instances of three departments, completely organized and maintained in the same building, known as male, female, and primary departments—the male and female departments being each a distict grammar school. In the year 1852, in a report made by the board of education, filed in the office of the clerk in the city and county of New York, in pursuance of the act of 1851, under the general head of ward schools, the departments are classified as “ male schools,” “female schools,” and “primary schools.” This division of the ward schools above the grade of primary into separate departments proceeds from the fact that there is practically no mixed education of the sexes in the common schools of the city of New York— the boys and girls being taught in separate schools or departments, and generally as an economical arrangement, and for convenience as to locality, in the same building, especially constructed for such purpose.
According to the testimony of Mr. Davenport, the *414 deputy clerk of the board of education, at the time of the death of the testator there were eighty-seven schools—that is, departments—above the grade of primary, and which were grouped and organized in forty-six school houses ; of this number, thirty-eight were for girls and forty-nine for boys.
Although two departments are in the same building and each is recognized by the number which marks the building, these departments are in fact entirely separate schools, as much so as if they occupied separate buildings. Each has its own principal, vice-principal, and teachers, and occupies its distinct part of the building, as does a primary school when in the same building with the grammar school.
The testator had in his lifetime been a school officer and the president of the board of trustees of his ward. He was a frequent visitor of the schools and took great interest in their success and usefulness, and in his life time had made donations to the schools in all the wards, and well knew of the distinct organization of the grammar schools, and of the grouping and instruction of the boys and girls in separate schools called departments.
He was conversant with the fact that in the same building both the grammar and primary departments were separately organized, and that the number designated not only the building but each department, whether grammar or primary.
I am of the opinion that it was the intention of the testator to regard each department, boys and girls, as it is in fact, a separate ward school, and that the board of trustees took for each such school a gift of $250. The testator may have appreciated the practical difficulty of the selection of books for a common library for the two sexes, and of its inconvenient administration in a system where a known policy prevailed of educating the boys and girls in separate schools.
*415 These legacies, as already observed, vested in the trustees for the purposes declared in the will at the death of Mrs. Holbrook.
In Manice v. Manice, Rapallo, J., says that “it may be laid down as a general rule, that when by a will, shares or interests in real or personal estate, to be ascertained by a division, are given, or where the real estate is directed to be sold and the proceeds divided, the estate or interest of the devisee or legatee in the property to be divided or converted, is a vested interest upon conversion or division.”
In that case it had been objected that, according to the terms of the will, a trust was created, to commence at the time of the death of the widow, to appraise, sell, and divide the property, and that the intention of the testator and the legal effect of the will were to vest the entire estate in the trustees and render it inalienable while the trust was being performed.
But it was held that time so consumed, although protracted, did not render the dispositions of the will invalid, nor prevent the vesting of interests in the legatees or devisees.
A question arises as to who is entitled to the income, rents, and profits derived from the estate from and after the death of Mrs. Holbrook.
And first, it is claimed by the legal representatives of the widow, that there should be an apportionment of the rent for the month or quarter as the case may be, ending next after her death—she having died intermediate the beginning and ending of the month or quarter. The testator having given all the rents and profits to his widow during her life, the claim for the rents up to the day of her death, although it involves' an apportionment, would seem to be equitable and just, and according to the manifest intention of the testator, and should be allowed, unless contrary to the principles of law or adjudged cases. [Some remarks *416 in this connection on the power of trustees to lease, are omitted.] The fact that the trustees gave leases whose terms extended beyond that event, affords no sufficient reason why a proportionate part of the rent, and up to her death, and with respect to which she presumably adjusted her living, should not be allowed to the legal representatives of the estate of the tenant for life.
The provision of the will, being accepted in lieu of dower, should have generous construction. It is true that equity follows the law, and will not interfere to disturb the right of the reversioner to rent falling due after the commencement of his estate in possession. In Marshall v. Mosely, 21 N. Y. 280, the testator had given a lease for a term which ran beyond the life of the tenant for life. In such case the life tenant took her estate charged with the lease and all its legal consequences and burdens. It was there held that the rent falling due for the quarter next after her death, according to the common law, could not be apportioned, and equity could not interfere.
The present case more nearly resembles Paget v. Gee, 1 Ambler, 199 ; Exp. Smyth, 1 Swanst. 337; where the rent was apportioned. And I am of the opinion that there should be an apportionment here (1 R. S. 5th edition, 747, §§ 16, 22).
There is no distinct reference made in the will to the income and profits of the estate accruing after the death of the tenant for life ; nor is there any disposition made of them specifically by the testator, which would seem further to show an intention on the testator’s part that there should be an immediate conversion and distribution of his estate, among those entitled thereto, after the death of his wife, leaving the least possible time for any income to arise, and that whatever increase might arise from such source should belong to those to whom his estate, after the payment *417 of the specific sums directed to be paid thereout, was given (Manice v. Manice, supra).
These rents and profits are now claimed by the heirs-at-law of the testator, upon the supposed ground that until sale the title vested in them.
In Moncrief v. Ross, 50 N. Y. 431, a similar claim was made by the heirs of the testator, to the exclusion of those to whom the proceeds of the estate, after a sale directed to be made, was given.
But it was there held that the will then under consideration gave the executors no title to the real estate, or right to receive the rents and profits ; that the title did not descend to the heirs, nor were they entitled to the rents and profits, but that through the absolute power of sale with which the executors were intrusted, the land was equitably converted into money, and that the entire proceeds, including rents received after the death of the tenant for life, belonged to those to whom the proceeds to be realized on the sale of the lands was given.
GtBOVee, J., in terms held “that any income derived from the real estate, before the sale had been made, belonged to the sisters,” the persons to whom the proceeds of the sale was given (Rogers v. Ross, 4 Johns. Ch. 397).
By the will of Mr. Holbrook, the entire proceeds, after the payment thereout of the specific sums given, and directed to be paid therefrom to various persons and societies by the fifteenth and preceding clauses of the will, is devised and bequeathed by the sixteenth clause to Samuel R. Betts, and to the several institutions named as the devisees and legatees of all the rest, residue, and remainder of the testator’s estate.
In pursuance of this devise and bequest, I am of the opinion that upon the death of the widow the real estate vested in such persons and societies, the dispositions in whose favor are herein adjudged to be valid, *418 as were capable in law of taking real estate, subject, however, to be divested by the excution of the power of sale, and subject to the payment therefrom and the proceeds of the sale, of the legacies and gifts herein declared to be valid, and to the heirs of the testator of the sums included in the gifts declared to be invalid. But this conclusion does not necessarily entitle such persons and societies to the whole income thereof, which has been in fact collected by the executors. But that five-sixths of said income belongs to, and should be distributed amongst the residuary legatees, except the Home Missionary Society, each to have one-sixth thereof, and the remaining sixth goes to the heirs-at-law of the testator.
This result I believe to be in harmony with Moncrief v. Ross, supra, and also substantially so with Wright v. Trustees of the Methodist Episcopal Church, Hoffm. 202. [The determination of a question of interest and a reference to an apportionment of expenditures, not involving an expression of opinion of general interest, are here omitted.]
Having considered the objections urged to the gifts of specific sums made to the various persons and societies to which exception has been taken, and having come to the conclusion that certain gifts are invalid, the question arises: what becomes of the subject of such gifts \
General residuary legatees take whatever personal estate is not legally disposed of, but it is otherwise with respect to real estate (Banks v. Phelan, 4 Bard. 80).
The residuary clause in a will does not, in general, embrace real property which the testator had designed to give to other persons than the residuary legatees (Van Kleeck v. Reformed Dutch Church, 20 Wend. 457).
It appearing that the personal estate was not much *419 more than sufficient to satisfy the debts of the testator, and the gifts contained in the clauses of the will anterior to the fifteenth, the real estate must needs be sold, under the powers conferred, to satisfy the gifts provided for in the fifteenth clause, as it must be for division and distribution. It has already been concluded that all the real property was, under the direction of the testator to sell, equitably converted into personalty for all the valid purposes of the will.
“ Where a sum of money, part of the proceeds of real estate, is in terms given to an object incapable by law of taking, the authorities respecting its destination are conflicting” (1 Jarman on Wills, 568).
The preponderance of authority is, however, in favor of the heir. Smith v. Claxton, 4 Madd. 484, holds that “when land is devised to be sold, and there is a partial failure of the purpose of the devisor, but there remains some purpose of the devisor to be answered by a sale, then the heir takes the benefit of the partial failure. He takes it, however, as money. Where there is a total failure, the heir takes the land as real estate” (Yates v. Compton, 2 Pierre Williams, 308 ; Bartholomew v. Merredith, 1 Vern. 276; McCarthy v. Terry, 7 Lans. 236 ; Williams v. Coade, 10 Vesey, 500 ; Ackroyd v. Smithson, 1 Brown Ch. 503; Maugham v. Mason, 1 V. & B. 410; Wright v. Meth. Episcopal Church, Hoffm. 202 ; Hawley v. James, 7 Paige, 213; Wood v. Cone, 7 Paige, 471; Wood v. Keyes, 8 Paige, 365).
In the case of Bogert v. Hertell in the court of errors, supra, it is stated, per Nelson, Ch. J.: “But if, notwithstanding á partial failure, the purposes of the will still require the conversion, though the heir takes the share, failing the devisee, he takes it as money, that being the state into which it is directed to be converted, and not as land. Now, so far as regards this undisposed-of interest, that goes to the heir, and *420 is not to be distributed according to the purposes for which it was directed to be converted, that is, the purposes of the will. It is not, I admit, considered strictly as belonging to the personal estate of the testator, or as constituting a part of the general assets ; but it is regarded, by this total or partial failure, as' having become separated from the mass of the personalty, and held by the executors as trustees for the heir, or those to whom it may belong.”
In Hawley v. James, 5 Paige, 444, the chancellor says: “ But where the object of the conversion fails either wholly or in part, whether such failure be occasioned by the incapacity of the devisee or legatee to take, or because of the illegality of the disposition attempted to be made of the converted property, or of any particular interest or estate in such property, or from any other cause, there will be a resulting use or trust or estate in the property, or in so much thereof as is not legally or effectually disposed of, in favor of those who would have been entitled to such property, if the conversion thereof had not been directed by the will ” (Gott v. Cook, 7 Paige, 534).
King v. Woodhull, 5 Edw. Ch. 82, seems, however, to hold that the subjects of the void gifts sink into the residuary estate, and pass to the residuary legatees.
For the reasons hereafter stated, Ido not think that the terms of the sixteenth, controlled and modified in this regard by the seventeenth clause of the will, are sufficient to carry the gifts adjudged void, to the residuary devisees and legatees, and so much of the proceeds arising on the sale of the real estate as would be necessary to satisfy these gifts must be paid to the heirs-at-law of the testator.
The remaining question—and it is one of great importance—arises out of the sixteenth and seventeenth clauses of the will, and involves a careful consideration to reach a proper construction of their provisions *421 in relation to the disposition of all the rest, residue and remainder of the testator’s estate. It has been decided above that the American Home Missionary Society, one of the devisees and legatees interested in this residue, from the fact of its being a voluntary, unincorporated society, is incapable, as well in law as in equity, of taking any portion of the testator’s estate.
The question which then presents itself, and which has been discussed with ability by the counsel, is—does the will dispose of the subject of the invalid gift ? or did the testator as to it die intestate ?
The first question which arises under this head is whether the devise and bequest contained in the sixteenth clause, to Samuel R. Betts and five societies, of the rest, residue, and remainder of the estate, is made to them as a class, as is claimed by the counsel for the other residuary devisees and legatees, or whether a distinct share is given to each. If made to them as a class, the want of capacity on the part of either of the residuary devisees and legatees would not vest such void share in the heirs or next of kin of the testator, but the survivors of the class would take the same. The rule is otherwise if the gifts were to the person and societies nominatim, a fixed sum or proportion to each. A part of the residue, of which the disposition fails, will not accrue in augmentation of the remaining parts as a residue of a residue, but instead of assuming the nature of a residue devolves as undisposed of. (Skrymsher v. Northcote, 1 Swanst. 570; Beekman v. Bonsor, 23 N. Y. 298).
By the sixteenth clause of his will the testator gave to Samuel R. Betts, and to the five societies named, all the rest, residue, and remainder of his estate, “ whatever the same might be, in equal divisions thereof, being one equal sixth part to each person, association, institution, asylum, or society mentioned in the article.”
*422 Under the decisions, it would seem that this is not a devise or bequest to the person and societies named as a class, but is a gift of one equal sixth part of the residue to each of them nominatim.
Had the clause stopped with the words “whatever the same may be,” it might well have been considered a complete gift to a class. But the testator goes further, and uses language which qualifies all that has gone before, and gives to each “ one equal sixth part.”
In White v. Howard, supra, the testator directed that whatever remained of the trust fund should be divided “equally between the following six-societies,” naming them. But the gift was not accompanied, as in this case, with the words, ‘ ‘ one equal sixth part to each.” Yet, in that case, some of the societies being unable to take, and the provision in their favor having been adjudged void, their portions did not go to increase the shares of the remaining two societies who were able to take, but went to the heirs-at-law of the testator. It is true, that the two societies, in that case, who took their respective shares, did not appeal to the court of appeals, but acquiesced in the judgment of the supreme court, and it may be that the court of appeals did not at all consider the question as to whether the two societies named were not entitled as survivors to the shares pronounced invalidly disposed of. Grover, J., says: “The two defendants last-named have not appealed from the judgment, and cannot, therefore, ask for any modification thereof favorable to them.”
But the supreme court at special and general term held that the void shares did not vest in the surviving residuary devisees but in the heirs of the testator’s only daughter, his sole heir (Downing v. Marshall, supra).
The case of Chamberlain v. Chamberlain, supra, with the appended note by the reporter, is cited by the *423 counsel for the residuary legatees who are capable of taking, as sustaining the position that if any of the residuary devisees or legatees cannot take the provisions in their favor, their portion of the residue, under the clause in question, vests in the other devisees and legatees, and not in the heirs at law of the testator. In that case the testator directed that all his estate not otherwise disposed of, be divided into two equal parts, one of said parts to .be paid to the Centenary Fund Society, and the other of said parts to be paid to the Trustees of the Chamberlain Institute.
The societies were respectively corporations, and were limited by their charters as to the amount of property they could take and hold. Besides, the testator had undertaken to give the two corporations, in the aggregate, more than one-half of his estate.
Allen, J., in his opinion held, that “if the two legacies, when ascertained, shall, in the aggregate, exceed in amount the one-half of the estate, after the payment of just debts, they must be reduced by proper deductions. If the amount payable to the Chamberlain Institute shall not exceed the one-fourth of the estate, that is the one-half part of that which may by law be given to charitable institutions, no deductions will be made from it, but the deductions will be made from the bequest to the Centenary Fund Society, to bring the amount within the statutory limit. That is, these deductions must be made from each so as to bring them within the one-fourth of the estate to which each is entitled.”
By the note at the end of the case it appears that the decision was modified, it being held that ‘ ‘ If the Chamberlain Institute, by reason of the restrictions imposed by law upon its capacity to take and hold property, shall be incapable to take and hold its one-fourth of the estate of the testator, after payment of debts, &c., the Centenary Fund Society will be entitled *424 to take, to the extent of its capacity, the residue of the one-half effectually bequeathed by the eighteenth clause of the will, to those two corporations.” ,
I cannot perceive that such modification allowed to the Centenary Fund Society anything more than the testator in words gave it. He could legally bequeath to these good purposes one-half of his estate. He did, in fact,, give one-half to each society, and in taking the residue of one-half, after deducting what the Chamberlain Institute could legally take and hold, the Centenary Fund Society did not then succeed to as much of the testator’s estate as was in terms given to it.
•This case gives no support to the suggestion that the devise and bequest was to the legatees as a class, or that the fund was distributed by the court upon any such basis. The case of Hoppock v. Tucker, 59 N. Y. 202, contains a careful examination of this subject, lately made. The will of H. divided his residuary estate into six equal parts, corresponding to the number of his children. One part, after deducting a specific legacy, he bequeaths in equal proportions, share and share alike, to J. H. and W. E., children of his deceased daughter, A. M. W. E. died leaving no descendants, previous to the death of the testator. The question was whether the share that would have come to him, had he outlived the testator, lapsed or survived to his brother named as the representative of a class.
Church, C. J., said, “ It must be conceded that the clause, as it is written, with its double description, free from influence or control of other portions of the will, would, according to the adjudicated cases, be construed as a personal legacy to each child. The law infers this intent from the specification of names, and regards the descriptive portion of the clause as intended for identification.” The chief justice, however, adds : “ An intent, inferable from the language of a particular clause, may be qualified or changed by other portions *425 of the will, evincing a different intent.” He then proceeds to a critical examination of the other portions of the will, and arrives at the conclusion, that it was the intention of the testator to “regard the children as taking as a class,” and also to “ dispose of his entire estate,” and adds, as the result of his examination of all parts of the will bearing upon the question of intent, “It is quite clear, therefore, that the legacy to the deceased child of Mrs. Tucker could not be disposed of as in case of intestacy against the expressed intent to dispose of all the property.”
And this brings us to the consideration of the remaining question, the testator’s intention to be gathered from other portions of the will, and which expressed intention must control in the disposition to be finally made of the case.
In cases of doubtful construction of parts of a will, such reasonable view should be adopted as will give effect to the intention of the testator, if it can be done without violating the rules of law.
The maxim from Colee upon Littleton, 322, “ Quod ultima voluntas testatoris est perimplenda secundum ver am intentionem suam,” was invoked by the senior counsel for the plaintiffs, both as a safe guide and controlling principle in the judicial construction of the writing, by which the testator has made an intelligent and discriminative disposition of the property, which, by activity in commercial enterprise and prudence, he had himself accumulated, as his reason and conscience approved. But we should not be insensible to the other rule, that the heir is not to be excluded without an express devise, or an implication so strong that an intention to the contrary cannot be supposed (Jarman’ s Fifth Rule).
In the opening sentence, the testator, “being of sound and disposing mind and memory,” declares the purpose of his last will and testament, “intending *426 hereby to dispose of all the estate, both real and personal, of which I may be seized or possessed, or to which I may be entitled at my decease.”
The introductory part of a will is admitted to have some effect in the construction of subsequent devises (Earl v. Grim, 1 Johns. Ch. 494). In Youngs v. Youngs, 45 N. Y. 254, Grover, J., gave effect to the language of the opening sentence of the will, which, in its terms, was not so expressive as that used by the testator in the case under consideration. This learned judge, after quoting the words from the introductory part of the will, says: “This clearly indicates the intention of i;he testator to make the will speak at the time of his death, and to dispose thereby of such property as he might at that time own, whether real or personal.” This intention appears to have been at no time absent from the mind of the testator. Having in the previous provisions of his will made bequests to relatives and friends, in the ninth clause he is careful to provide that if any of the legatees should fail to claim their legacies within a time by him limited, or in the event that either of the legatees should die in his lifetime, the testator directs that the amount of such legacies should form a part of his general estate.
The testator then, in the clauses of the will which have heretofore been considered, proceeds to make provision in detail for such other persons and societies, as in his judgment had claims upon his bounty, and then adds this unusual clause :
“ Seventeenth. It is my will and desire that none of the devises and bequests contained in this, my will, should fail or be rendered void by reason of the misnaming of any individual or institution, but that the same should be carried into full effect, without regard to any such misnomer, if such individual or institution can be ascertained with reasonable certainty; also, should any individual or institution named in this, my *427 will, not have existence at my decease, or be so improperly named as not to be ascertainable with reasonable certainty, or should any individual or institution be named by me in mistake, there having been no such person or institution ; then in all such cases my will is, that the amount so intended for such institution or individual, shall lapse and be merged in my general estate, and form a part of the rest, residue, and remainder thereof.”
The provisions of the seventeenth clause apply to all the devises and bequests contained in the will, not only to those contained in previous clauses, but to those embraced in the sixteenth clause,—“ none of the devises and bequests should fail,” for the causes enumerated by him.
The question then arises, are the gifts contained in the fifteenth and sixteenth clauses of the will, which have been declared to be void, disposed of by the seventeenth clause, or as to them did the testator die intestate ?
And first it is to be observed, that the testator has been careful to state the grounds of failure, through which the amount intended for any institution, should be merged in his general estate, and form a part of the residue.
The enumeration of specific grounds would seem to exclude any other, unless the intention of the testator to actually dispose of his whole estate to which allusion has been made, can be aided by construction, and extended to embrace other causes of failure, for which no express provision has been made. The sole ground upon which the gifts to the American Home Missionary and other societies, similarly situated, has been declared to be void, is that they were voluntary, unincorporated, charitable societies. This ground of exclusion is clearly not within the causes mentioned in the seventeenth clause. There has been no misnaming, *428 nor is there difficulty of ascertaining these societies. They severally, had existence, not as corporations it is true, but each was a living organized society in full operation;—nor was any of these institutions named through mistake. It is quite evident that the testator did not regard the want of corporate existence on the part of any society, as any reason why it should not take the gift in its favor. He evidently considered, from the number of such societies selected as objects of his benevolence, that the fact of their being voluntary organizations was no valid reason why they should not participate in his bounty. The able counsel who prepared the will, without doubt, also, so judged, and there was reason for such conclusion found in decisions of the courts theretofore made. Hornbeck v. American Bible Society, 2 Sandf. Ch. 133; Potter v. Chapin, 6 Paige, 639; Banks v. Phelan, 4 Barb. 80, recognized the right of an unincorporated charitable society to take by bequest. The testator intended without doubt that they should take, and supposed that he had in fact disposed of all his estate, and by the seventeenth clause anticipated and stated all the grounds through which any gift might by any reasonable cause fail, and he had attempted to provide against the consequences of such failure.
When it is stated that the intention of the testator must be fully carried out, and that there must be reasonable construction exercised, to give full effect to such intention, it should also be stated that there are certain rules by which the court, in construction, is itself controlled.
The province of the court is to ascertain the intention, which the will itself expresses, or, by implication, declares. In Abbott v. Middleton, 7 H. L. C. 91, Lord Ceanworth says: “ It is not the duty of a court of justice,to search for the testator’s meaning, otherwise than by fairly interpreting the words he has *429 used,” and in the same case, Lord Wensleydale : “The use of the expression, that the intention of the testator is to be the guide, unaccompanied with the constant explanation that it is to be sought in his words, and a rigorous attention to them, is apt to lead the mind insensibly to speculate upon what the testator may be supposed to have intended to do, instead of strictly attending to the true question, which is, what that which he has written, means. The will must be expressed in writing, and that writing only is to be considered” (p. 114). In construction, words are to be taken in their ordinary, proper, and grammatical sense; unless it be apparent from the connection in which they are used, that they were intended in an extended or abridged sense.
And no meaning should be given to words, other than that they are reasonably capable of bearing.
The only clause used in the seventeenth paragraph of the will, which could for any reason be held to embrace the ground, upon which the American Home Missionary Society is excluded is, “should any institution named in my will not have existence at my decease.” The only way effectually to aid that clause, to enable it to embrace the ground of exclusion of the Home Missionary Society, would be to write in the will the word “ corporate” before existence. That we have no right to do. It would be to import into the will a provision not contemplated by the testator, to avoid a contingency upon which he had not calculated.
For these reasons, I am of the opinion that the subject of the gifts to the American Home Missionary Society, and the other societies, which have been decided to be invalid and left beyond the operation of the will, the same being the proceeds of real estate directed to be sold, go to the heirs-at-law of the testator (Lloyd v. Lloyd, 4 Beav. 231; Green v. Pertwee, 5 Hare, 249 ; *430 Salt v. Chattaway, 3 Beav. 576; Simmons v. Rudall, 1 Sim. N. S. 115 ; Skrymsher v. Northcote, supra).
And the case of Humble «. Shore, 7 Hare, 247, would seem to decide, that even if the void gifts were, by operation of the seventeenth clause, carried to the residue of the estate, the subject of them would still be undisposed of ; for in that case, where a gift, by a will, of one-sixth of testatrix’s residuary estate to S.W., revoked by a codicil, and the same sixth given to S.W. for life, with a direction, after her decease, to pay a legacy thereout, and the remainder of said sixth should sink into the residue of the testatrix’s personal estate, and be disposed of accordingly. It was held that remainder of the sixth of the residue was not thereby given to the other residuary legatees, but was undisposed of.
The language of the seventeenth clause of the testator’s will in regard to the final disposition of the void gifts is not so comprehensive as in Humble v. Shore. It simply provides that they shall form a part of the rest, residue and remainder of his estate, and gives no express direction as to their ultimate destination.
I have considered all the parts of the will which have been presented for construction and judgment, and have reached conclusions with respect to all the devises and bequests concerning which questions have arisen by which the rights of all claimants are decided, and the estate may be divided and distributed among those who are declared to be legally entitled thereto.
Although some of the questions are new, and others involved in conflict of decision, yet I have endeavored to reach a result in harmony with the intentions of the testator, gathered from the language of the will, and to give effect to such intentions so far as the dispositions made by him are legal, by the application of approved principles of construction and the rules and principles of law and equity applicable to such cases.
*431 [A reference to some questions not disposed of is omitted.]
Judgment ordered accordingly.*
On the settlement of the judgment, Mr. Maltby, for the heirs-at-law, objected to the granting of an extra allowance, in addition to costs, asked for by other parties.
C. Wyllys Betts, for the executor.—I. When the whole will is in controversy, through the testator’s use of careless or ambiguous language, the whole estate must bear the cost of an authoritative construction (3 Br. C. C. 27; 6 Ves. 349; 1 Sch. & Lef. 12; 3 P. Wms. 303 ; † Wood v. Vanderburgh, 6 Paige, 277). It will be seen that these decisions do not apply to the suit for the construction of the will of Ephraim Holbrook. For as the questions before the court arose, “ not so *432 much from any obscurity in the language of the instrument, as from an apparent conflict in decisions with respect to the same,” no questions have arisen here from the testator’s fault. It appears also that this suit would not have been brought by the legatees. In strong contrast appears the pleadings and briefs of the heirs-at-law. Reason and justice demand those who have brought this suit upon the estate should themselves bear its expense.
II. The costs and charges should not be paid out of the general residue, but out of the fund in controversy (Smith v. Smith, 4 Paige, 271; Rogers v. Ross, 4 Johns Ch. 608 ; Martineau v. Rodgers, 8 De Gex, Macn. & G. 328, 335; Jenour v. Jenour, 10 Ves. 562; Atty. Gen. v. Lawes, 8 Hare, 32; Re Cawthorne, 12 Beav. 56). This rule is also recognized in Trick’s Trusts in 1869 (L. R. 5 Ch. App. 170 ; Row v. Row, L. R. vol. 7, Eq. Cas. p. 414, 1869 ; Barton v. Cooke, 5 Ves. 461; Nisbett v. Murray, Id. 149 ; and 41 N. Y. 514-5).
III. The well-recognized rule of law, that the intention of the testator should be carried out, so far as the power of the court extends, demands that all the legacies which he has validly bequeathed be paid to the dollar. He has validly bequeathed five-sixths of the residue, and by the words, “the residue of my estate,” he meant the whole estate, after paying the legacies of stated amount, and executors’ commissions, and other usual charges of administration. He did not contemplate this expensive suit, which the heirs have brought upon the estate; and its cost should not be charged upon the validly bequeathed shares of the residue, any more than upon the valid legacies of stated amount (Harris r. American Bible Soc., 2 Abb. Ct. App. Dec. 316). The first fund should be the invalidly bequeathed portion of the estate. The second, the validly bequeathed residue. The third, the income (108 Mass. 283). The fourth, the valid specified legacies.
*433 The Court, after consideration,
Held, that allowances could be granted to both parties, including legatees defendant, who were not successful, not exceeding $2,000 in the aggregate to each side,* the allowance to the attorneys for the executors to be without prejudice to such additional sums for counsel fees and charges incurred by the executors as should be found due upon a reference ordered for this and other purposes.
It was further adjudged that one-half of the allowances and taxed costs be taxed upon the five valid shares of the residuary bequest, and that the other half be charged upon the shares which went to the heirs-at-law.
The subject of costs and allowances to the executors, &c., was referred to Henry J. Scudder, Esq., referee, and the following opinion was rendered :
Scudder, Referee.—The learned counsel for the executors and plaintiffs herein contends, with no little ingenuity, that the construction hitherto given in practice to the statute, allowing commissions' to executors is erroneous, and that such commissions should be allowed upon a principle of classifying sums instead of aggregating them. Thus, in an estate of $100,000, if the sums received and paid out should be in items of $1,000 each, five per cent, should be allowed.
I have no doubt that a sufficient answer to this claim on the part of plaintiffs’ counsel would be found in the long and uniform construction, not only of the court in which the matter is pending, but that of the surrogates and of the masters in chancery and referees before whom the question of proper allowance of commissions has heretofore arisen; and, so far as I can learn, the rule of construction adopted by Chancellor *434 Kent in 3 Johns. Oh. and subsequently formally enacted by the legislature into a statute, has been uninterruptedly and consistently adhered to. I have never known it, until now, questioned in practice or doubted in the decisions.
But aside from the weight of this long run of usage and authority, is there anything in the statute that would support the plaintiffs’ claim, if it were one of first impression ? I think not.
The language “for receiving and paying out all sums of money, not exceeding $1,000,” clearly imposes a limit where the application of the five per cent, ceases. Is this limit of class or aggregation ? If of class, an easier and more direct way rested with the legislature to designate it, and it is a wise rule in interpreting statutes to consider the legislature as using the shortest and best mode of conveying their meaning. If the intent had been to give five per cent, upon “each” sum not exceeding $1,000, the particularizing word-•would have been used. The phrase would have been clear, and its understanding admit of no dispute. The language actually employed is the reverse of this ; it is of an aggregating nature—“all sums.” No matter how many, but “not exceeding.” Not exceeding how? Clearly, in the ordinary and usual sense of these words, in that “all sums do not exceed $1,000”—not “any sum,” or “each sum,” but the comprehension of the whole sums. The force of the “plural” must not be overlooked in this statute. The use of the “singular ” would be the opposite of the thought conveyed in the plural. Yet it is the singular form in fact, that the plaintiffs contend should be the one controlling the meaning, and without resort to which, there could certainly be no foundation for their argument. This view is strengthened by the phraseology of the next paragraph of the statute, where the word “any” is used in place of “ all,” but as the qualification still of *435 the plural “sums,” and directly connected with the word “amounting,” in order to make an aggregate that shall form a limit where again the application of the two and a half per cent, ceases.
In the next paragraph the restriction is removed altogether, and the language is harmonious with such removal. I see no importance in the preposition “of.” It is artificial, but in or out of the sentence has no governing power. Its provincial tone would incline one to attribute the wording of this portion of the statute to a person not thoroughly used to the elegancies of diction, but it demands no other criticism.
I need not enlarge upon this statute. It impresses me so deeply with the possession of but one meaning, and that the customary one, that I must deny the plaintiffs’ application, and allow commissions according to the usual mode of computation.
The counsel for Mr. Frederick J. Betts, one of plaintiffs, also asks that there be an allowance in the form of extra compensation made to this executor, and rests his claim upon the peculiar circumstances under which Mr. Betts assumed the charge of the estate, the character of the will, the residence of Mr. Betts, and some instances where great care and intelligence were required in the proper and prudent administration of the property held by the executor. I recognize in the devotion and fidelity of the executor, a very proper foundation for the enlargement of the compensation afforded by the statute, if any rule or decision permitted an increase of his statutory remuneration ; but I find no authority in favor of such increase, and very decided against it. In Collier v. Munn, 41 N. Y. 143, a claim upon principle exactly analogous with this, formed one of the subjects of discussion by the court, and the opinion is so directly applicable, so clear and so thorough, that I need only refer to it and the case, as disposing of the demand in this respect.
*436 A further claim is made under the statute of 1863, chapter 362, for the allowance provided, upon the settlement of executors’ accounts, for counsel fee, not exceeding ten dollars for each day engaged in preparing for settlement. I think this is a proper allowance, and as there is evidence that fifty-six days were devoted to the preparation, five hundred and sixty dollars, in addition to the usual commissions, will be allowed the executors.
Mr. Benedict’s claim for commissions upon sums received and paid out prior to his qualifying as executor, seems to me to be determined by the statute itself.
Section 8 of chapter 362, Laws 1863, has this language : “On the settlement of the account of an executor or administrator the surrogate shall allow to him for his services, and if there be more than one shall apportion among them according to the services rendered by them respectively.” * * “ For receiving and paying out all sums of money,” &c., &o. * *
The purpose is obviously to provide, 1st, compensation to the executor for services rendered by him; 2nd, to determine the amount of such compensation. Up to the time of Mr. Benedict’s qualifying as executor, he rendered no services, and hence, there was no foundation upon which to rest any compensation. There was nothing to compensate. This matter of commissions is not to be treated upon the principle that controls the executor’s title to property, but as a subject of compensation purely, and as no services were or could have been rendered before the executor qualified, so no commissions can be allowed until that time.
Commissions are also claimed upon a sum received by the executors upon the sale of a portion of the estate, and afterward invested in order to produce income. I apprehend, however, that this is not that condition of receiving and paying out which entitles *437 an executor to charge commissions. The executors here were charged with a trust continuing through the life of Mrs. Holbrook, yet held the estate as executors ; and hence, the rule adopted in Valentine v. Valentine, 2 Barb. Ch. and approved in Drake v. Pine, 5 N. Y. 430, controls, and they can receive commissions only upon the aggregate of the capital and income as received once and paid out once (See also Dayton Surrogates, 535).
Bests are contended to have been made by reason of a necessity to avoid overpayment to Mrs. Holbrook ; but I do not understand such a rest as the courts require, in order to allow the executors to enter upon a new account to have occurred after the settlement of the accounts in 1868, down to the time of the death of Mrs. Holbrook. That an executor may make annual rests by passing his accounts before a proper tribunal seems undisputed, but, unless he do so, there appears no sure ground upon which a rest can be sustained, except the compulsory one sometimes resorted to by the courts, in order to charge the executors with interest upon funds held or used by him individually. I cannot, therefore, allow the rests claimed for the purposes they are urged.
As to Mrs. Holbrook’s commissions:
The personal estate is conceded on all sides to have been more than $100,000. Mrs. Holbrook qualified as executrix, and joined in several important acts. She gave no special personal attention to the management of the estate, and if her right to commissions rested alone upon actual services rendered, the allowance to her would properly be measured upon a small standard ; but in estates exceeding $100,000, the statute peremptorily fixes an allowance for each of the executors not exceeding three. This case comes within the statute, and commissions should be allowed her on *438 sums received and paid out on what is called the general account.
Upon the commissions so to be allowed, the executors now acting claim commissions. I see no good reason for such claim. It is not upon every act of parting with money that' executors become entitled to commissions, or they would be allowed upon re-investments. In this case they only hold what belonged to a co-executor, who was prevented by death from receiving it in person without the intervention of the present executors, had she so chosen. I cannot allow •this claim.
A question is raised as to what in this estate should be regarded as permanent improvements, and it is discussed upon the cases and principles applicable to the estates of life tenants and remainder-men. The executors in this case were seized of the property left in trust, and Mrs. Holbrook was simply a beneficiary entitled to the income. The duty of preserving the estate in reasonable order, was a plain incident of the trust, and devolved upon the trustees, not upon Mrs. Holbrook. The investments of personal property and the care of the realty equally demanded prudence. Mrs. Holbrook occupied the house on Fourth avenue and Eighteenth street as her residence, and a furnace having been placed in this house during her life, at a cost of $327.03, it is urged that this sum should be apportioned —rthe premises being and having been in her exclusive possession. I cannot regard this improvement otherwise than one for her personal comfort, and at her request and direction, and I think its cost should be charged to her.
The repairs on the Fulton street stores differ in character from the one above. They were calculated both to permanently benefit the property and enhance its rental; thus the general estate was bettered, and the income of the beneficiary increased, and some ap *439 portionment should here be made, and I understand counsel assent to this.
The executors charge the estate with the sum of $475 paid to their agent, shortly after the accounting of 1868. The facts were, that the agent returned to them in his general account, a sum as collected from a tenant that had not been collected, and thus their account of 1868 was in fact erroneous to the extent of this sum. Later, the agent drew attention to the mistake, failed to collect the amount from the tenant, and claimed it from the executors, who paid it. All this was in good faith on both sides. The loss of the rent seems due to no fault of the agent, and certainly without fault on his part, he would be entitled to recover money thus advanced. The executors are entitled to hold this charge.
The executors present a bill of Betts, Atterbury & Betts, for legal services rendered them from December, 1874, to and including this hearing, and the final settlement of the estate. This bill has been rigorously contested, and considerable testimony introduced in in its support and against it. The bill presents many items of services, but none of values, simply aggregating the charge for the services in one sum at the foot of the items. The high character and intelligence of the witnesses, as well as the peculiar nature of the labors of the attorneys presenting the bill, have commanded my careful attention to, and close scrutiny of all its features. Various documentary evidences have also been produced, and several volumes of printed matter, embracing pleadings, proofs, motion papers, briefs, findings, and all the numerous parts of a closely litigated case, where many parties with conflicting interests are concerned, and are separately represented by lawyers of known skill and eminence, have been presented. With the oral testimony of counsel, long and widely known at the bar, and the mass of records *440 -—silent but impressive witnesses—before me, I am led, in passing upon the charges made against the executors, to consider what standard can be found for any professional services outside those of a merely mechanical or routine character, and I find none of such accuracy as to relieve me from the exercise of a discretion leading me to a' conclusion, from which others reflecting upon the same subjects might widely differ.
The common elements in value in professional matters are scope and thoroughness of learning, tact, and judiciousness in movements and arrangements, unyielding assiduity and perfect integrity, and these are abundantly found all along the course of proceedings in this case. I have been deeply impressed in my examination of these proceedings, and of the briefs prepared in them, with the fact that the skill and devotion of the executors’ attorneys in the prosecution of their duties, are most honorable examples of the high reach our profession has attained. While these considerations should not alone determine the propriety of the charges, they nevertheless characterize them, and have weight in reaching the conclusion to be formed. One of the attorneys, acting as counsel as well, testifies to the difficulty to be encountered in dividing a charge for such labor as this litigation demanded into items, either of time or performance, and such a subdivision is no.where attempted by any of the witnesses. Some approach to it is found in the adoption of periods, but, after all, it comes to an aggregate sum for an aggregate work. Thus presented, I cannot hesitate in adopting the proposition that those who labored side by side and in common with the gentlemen presenting this bill, are superior judges of its correctness. They, better than all others, knew the intense thought, the earnest fidelity and continuous application brought into operation and maintained throughout the existence of the suit, and thoroughly competent to criticise the abilities of *441 their co-laborers, can best inform, us of the value of services, many of which, rendered in the seclusion of the chamber consultation or the quiet of the library, make no display upon the bill, but have produced their effect upon the case. The opposing evidence is intelligent, and" has received very careful thought, but I cannot refrain from the conclusion that it is overborne by the direct and clear familiarity with the subject matter on the part of the witnesses sustaining the will. I am not disposed, therefore, to reduce the bill, so far as the services in the general litigation and suits are concerned, but there are two classes of charges that I cannot allow as against the estate. These are the trips to New Haven, and charges for delivering deeds on sale of property. These seems to me, after all the explanations, as unnecessary, when an executor was present and perfectly competent to act in the special character of lawyer, rendering the journey to New Haven needless, and certainly he could deliver the deeds. These charges, therefore, must be deducted from the bill, and the bill so corrected allowed.
Special Term, July, 1878.
The cause came before the court on the referee’s report in accordance with these views.
C. Wyllys Betts, for plaintiffs.
Anson Maltby, for defendants.
Van Vorst, J.
Upon careful consideration I have come to the conclusion that the learned referee, Mr. Scudder, is correct in his construction of the statute relating to the commissions of executors. Although much has been well urged by the plaintiffs’ counsel the other way, still, I am persuaded that the commissions are to be computed upon the principle of aggre *442 gating the sums until they reach the amount fixed by the statute regulating the commissions.
Such seems to have been the construction in effect given by the courts, and is, I am persuaded, agreeable to usage on this subject. This rate of compensation, fixed by Chancellor Kent, by a rule of the court of chancery, October 18, 1817 (Matter of Roberts, 3 Johns. Ch. 43), was afterwards substantially adopted by the legislature (2 R. S. 93, section 58).
I agree with the learned referee in the construction given by him to the amendment of 1849, chap. 160, and do not think the insertion of the word “of” in subdivision 3 of section 58 was intended to change the method of computation, or that it has that effect. This word is not found in the preceding subdivision of the section.
The following cases show that the executors’ commissions are to be adjusted upon the aggregate sum received and paid out (Hedges v. Ricker, mentioned in Hoffman’s Masters of Chancery; Matter of Kellog, 7 Paige, 265; Howes v. Davis, 4 Abb. Pr. 71; Matter of Bank of Niagara, 6 Paige, 216; Valentine v. Valentine, 2 Barb. Ch. 430; Drake yv. Price, 7 Barb. 388 ; S. C., 1 Seld. 430.)
It is suggested that these cases are all before the amendment of 1849. But it having been above held that the amendment did not change the substance of the rule theretofore existing, the cases are applicable.
Under the referee’s findings, I do not see how there can be an allowance for extra compensation to the acting executor, other than the allowance for preparing the account. The commissions were intended to cover all services rendered by the executor.
The principle of compensation may afford inadequate amends to the executor, who has with great fidelity, and intelligently and prudently managed the interests intrusted to him. But the law adjusts the *443 compensation, and it is not for the courts to decree in opposition to the statute when it speaks plainly. This conclusion sustains the referee in disposing of the subject of commissions erroneously retained by the executor.
But, under the circumstances, I think they should be paid over without interest.
The good faith of the executors cannot be questioned. And while the dealings with Mrs. Holbrook do not show that she had such accurate knowledge of the system of charges adopted as to amount to a ratification of or acquiescence in them, still, the absence of any question on her part or that of Mr. Hurry, in the face of some of the receipts, doubtless led the executor to believe that the rate of charges adopted' by him was satisfactory.
The executor retained what he believed was legal and proper, and in the absence of inquiry and dissent, I conclude that justice and equity are satisfied with the payment of the principal sum of the commissions retained.
The executor could, without doubt, have with propriety made frequent rests and accountings. Although it would have given some trouble to have done so, yet the effect of such course would have been to increase his compensation in the aggregate.
The evidence, however, does not show any actual rest or accounting between the year 1868 and the death of Mrs. Holbrook, and I understand that the error in retaining commissions occurred during that period.
I have examined each of the plaintiffs’ exceptions to the referee’s report, and reach the conclusion that the referee should be sustained and the exceptions overruled.
The defendants object to the allowance made by the referee to the attorneys for the plaintiff for legal services rendered by them. Considering the importance *444 and value of their services, the amount charged is in no regard unreasonable.
The litigation in this court growing out of the will of Mr. Holbrook involved weighty questions, and imposed upon the plaintiffs’ attorney and counsel great responsibility, and demanded learning, diligence and ability.
The learned counsel for the defendants, principally interested in the litigation, and who so well guarded his clients’ cause, will surely admit the plaintiffs’ case in its presentment, trial, and final argument was conspicuous with the presence of all three elements.
I consider that the amount allowed by the referee is not larger than the character and value of these professional services demanded.
The defendants’ exceptions are in no instance sustained, and they are severally overruled.
Ho further direction is required to be made with respect to the fees of the referee, which were heretofore ordered to be paid out of the general residuary fund, and the terms of the judgment are satisfied by the payment of the amount of the legacies adjudged to be invalid, in all §10,000, to those held to be entitled thereunto, without interest.
The result reached is that the report of the referee is confirmed.
Ho costs are allowed on this motion.

 An appeal was taken to test this question, but was superseded by a compromise.

 See also People ex rel. Willson v. Lathrop, 19 How. Pr. 358.

 Granville P. Hawes argued the following points in behalf of the trustees of ward schools in the twelfth and twenty-second wards (brief not received in time to be inserted in its proper place):—I. The defendants have power to take the bequests under the fifteenth clause of the will by their common law powers as corporations, and these powers are not restricted by virtue of L. 1851, c. 386, § 10 (Angell & Ames on Corp. 148, § 177; Downing v. Mitchell, 23 N. Y. 293; Everitt v. Everitt, 29 Id. 39; McCarter v. Orphan Asylum, 9 Conn. 437). The defendants are expressly created a corporation to hold all personal property vested in, or transferred to them for school purposes in their respective wards (L. 1851, supra). The power to hold necessarily involves the power to receive. The policy of the law is to favor the common school system, and to extend rather than to restrict the power to acquire property. II. The express power to take by bequest was conferred by L. 1840, c. 318; L. 1841, c. 261; L. 1842, c. 150; and this power was not abrogated by L. 1851, supra. The court is bound to adopt such a construction of these various acts as will give them all effect (People v. McKenney, 52 N. Y. 374; Roosevelt v. Godard, 52 Barb. 533; People v. Supervisors of Orange, 17 N. Y. 241; Clark v. *406 Rochester, 24 Barb. 471). HI. If the boards, of trustees of common schools cannot take as corporations, the trustees composing such boards will take as individuals for the purposes named. IV. The power of alienation is not suspended by the twelfth paragraph of the will. The right to these bequests vested absolutely upon the death of the testator (Manice v. Manice, 43 N. Y. 303; McCarter v. Orphan Asylum, 9 Cow. 441; McKinstry v. Sanders, 2 Supm. Ct. [T. & C.] 200). V. By the word “ school,” the testator undoubtedly intended a school embracing in its organization a principal, a vice-principal, teachers and scholars, and not a school building. VI. There were ten grammar schools in the twelfth ward, and six in the twenty-second at the time of the death of Mrs. Holbrook; the trustees of the twelfth ward are, therefore, entitled to $2,500, and the trustees of the twenty-second to $,1500.

 The following attorneys and counsel appeared for various parties named below, but no briefs were received from them.
Daniel Lord, Jr., for Half Orphan Asylum.
G. R. Schieffelin, for N. Y. Prot. Epis. City Mission Soc.
John W. Mitchell, for Gen. Prot. Epis. S. S. Union, &c.
Taylor & Lynch, for Sabbath Tract Soc.
Edward Heaton, for Prot. Epis. Soc. for Promoting Beligion, &c., Am. Tract Soc., and others.
W. D. Craft, for Trustees of Schools of Second Ward.
B. W. Townsend and A. J. Dyett, for Trustees of Schools of Seventh, Eleventh, Thirteenth, Fourteenth, and Twenty-First Wards.
Thomas C. Ennever, for Demilt Dispensary.
Lake A. Lockwood, for George S. Lee and others.
L. A. Baker, for J. Harvey Valentine, et al.
Scoville & De Witt, for John Edwin Cox, et al.
Scott D. M. Goodwin, for John J. Haunstein, et al.
Hamilton dole, for the Board of Education, and for Boards of Trustees of Schools of various wards.

 See also Straw v. Conference of M. E. Church, 67 Me. 2

 See also on this point, Noyes v. Children’s Aid Society, 3 Abb. New Cas. 36, and note.